**REVISED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 96-40687

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EDGAR CASTRO,

Defendant-Appellant.

**consolidated with**

_____

96-40694

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SUSAN GOMEZ,

Defendant-Appellant.

Appeals from the United States District Court
for the Eastern District of Texas

November 19, 1997

Before POLITZ, Chief Judge, DeMOSS, Circuit Judge, and DOHERTY,[*] District
Judge.

_____

[*] District Judge of the Western District of Louisiana, sitting by designation.

POLITZ, Chief Judge:

Edgar Castro and Susan Gomez were convicted on guilty pleas of conspiracy to possess with the intent to distribute and possession with the intent to distribute cocaine after a search of their rented Chevrolet Suburban revealed approximately 900 pounds of cocaine. Concluding that the cocaine should have been suppressed as evidence obtained in violation of the fourth amendment to the United States Constitution, we vacate the convictions and remand to the district court.

## BACKGROUND

On November 9, 1996 numerous agents from various federal and state law enforcement agencies conducted surveillance of Javier Vallaho in the Memorial City Mall in Houston, Texas.[1] During the course of the surveillance the agents observed Vallaho talking to Gomez and an unidentified male Hispanic. Gomez and the man then left the Mall in a grey van and drove to a convenience store located several miles distant. Upon arrival at the convenience store, the man exited the grey van and made a call from a public telephone. The man then drove to a nearby K-Mart and dropped off Gomez. Between ten and fifteen agents followed the van to the convenience store and then to K-Mart.

Gomez entered the K-Mart, purchased several innocuous items, and then used a nearby public telephone. Unbeknownst to Gomez, one of the agents overheard the entire content of this telephone call. During the course of this call Gomez made no reference to any illegal activity. Meanwhile, the van exited the

---

[1]Agents from the Houston Police Department, the U. S. Drug Enforcement Agency, and the Federal Bureau of Investigation cooperated in the surveillance.

2

K-Mart parking lot and was driven to a nearby residence. Ten agents in vehicles and a helicopter followed the van but the agents observed no illegal activity. After stopping briefly at the residence, the van returned to the K-Mart parking lot, the man exited and handed the keys to Gomez, and left in another car. Gomez then drove the van from the parking lot to a local motel.

At the motel, Gomez met Castro and Muriel Cristina Vicencio, and the three of them unloaded full grey trash bags from the van. Gomez, Castro, and Vicencio thereafter departed the motel in separate cars and drove back to the Mall. After spending approximately fifteen to twenty minutes inside, the three left the Mall in a rented blue Suburban and began traveling north on U. S. Highway 59. Castro drove the Suburban, Vicencio sat in the front seat, and Gomez occupied the back seat. The agents followed the Suburban for approximately 115 miles as it traveled through the Texas counties of Harris, Montgomery, and San Jacinto, finally entering Polk County. Because the agents following the Suburban did not have probable cause -- or even reasonable suspicion -- for stopping the Suburban, they determined to enlist the aid of the Polk County Sheriff's Department.[2]

The agents contacted the Polk County Sheriff's Department and informed Deputy Sheriff Mike Nettles that a rented blue Suburban "involved in a narcotics transaction" was driving through his county and needed to be stopped. The agents instructed Nettles that he had to "develop his own probable cause" for stopping the Suburban. Nettles positioned his patrol car prominently in the median of Highway

---

[2]The agents unsuccessfully attempted to secure the aid of the Texas Department of Public Safety as they trailed the vehicle.

59. As the Suburban approached, Nettles claims to have observed that the driver was not wearing a seat belt and that the Suburban appeared to be exceeding the posted speed limit. Nettles followed the Suburban for several miles and, while doing so, used his speedometer to calculate its speed. Nettles did not use the radar unit in his patrol car to determine the speed of the Suburban.[3]

Finally, Nettles turned on the flashing lights on his patrol car and pulled the Suburban over.[4] Nettles ordered Castro to exit the Suburban, informed him that he was being stopped for speeding and failure to wear a seat belt, and asked for a driver's license and car registration. Castro produced a valid Maryland license, and Nettles ran a check. The check revealed no outstanding warrants. Nettles then questioned Castro about his presence in Texas. Castro explained that he had flown to Houston with his wife, Vicencio, to attend a construction conference, and that they were on their way home. Castro further explained that Gomez was a family friend. Nettles then questioned Gomez and Vicencio, and Gomez explained that she had been in Houston with Castro and Vicencio to purchase winter clothing.

Characterizing the responses he received from Gomez, Castro, and Vincencio about the reason they had been in Houston and their destination as being somewhat inconsistent, Nettles decided to arrest Gomez and Vicencio for failure to wear a

---

[3]Nettles testified at the suppression hearing that he did not use his radar unit to clock the speed of the Suburban because he was afraid that to do so would "tip off" the driver of the Suburban about his presence. Nettles did not explain, however, why using the radar unit would be any more conspicuous than his presence in a marked patrol car on the median and then on Highway 59. In addition, Nettles conceded that his speedometer had not been calibrated in over three years.

[4]DEA agents were present on the roadside when Nettles stopped the Suburban.

seat belt.[5]  He placed the two under arrest and sought permission to search the Suburban.  Castro declined to consent.[6]  Nettles then impounded the Suburban and transported it and Castro, Gomez, and Vicencio to the Polk County Sheriff's Department.[7]  The Suburban was taken to the Polk County sally port purportedly for an inventory search.  Upon arrival, when Castro again refused to consent to a search, a drug dog was brought over.  The drug dog alerted in the cargo area of the vehicle and the ensuing search uncovered approximately 900 pounds of cocaine.  Castro, Gomez, and Vicencio were arrested on drug charges.  Neither Castro nor

---

[5]A question is presented, one which we do not now answer, whether Nettles was legally authorized to arrest a nonresident for a seat belt violation.  As a general rule, minor traffic violations are arrestable offenses under Texas law.  The Nonresident Violator Compact (NVC), however, carves out an exception to that general rule.  The NVC expressly recognizes that the practice of arresting nonresident violators and requiring them to post bond to secure their appearance "causes unnecessary inconvenience and, at times, a hardship for the motorist who is unable at the time to post collateral, furnish a bond, stand trial, or pay the fine, and thus is compelled to remain in custody until some arrangement can be made." TEX. TRANSP. CODE ANN. § 703.002 art.
I(a)(5) (Vernon 1997).  To remedy this problem, Texas adopted the NVC which specifically provides:
> (a) When issuing a citation for a traffic violation, a police officer *shall issue* the citation to a motorist who possesses a driver's license issued by a party jurisdiction and *shall not*, subject to the exceptions noted in paragraph (b) of this article, require the motorist to post collateral to secure appearance, if the officer receives the motorist's personal recognizance that he or she will comply with the terms of the citation.

*Id*. § 703.002 art. III(a).  The only exception to this mandatory procedure involves situations where Texas law requires the police to arrest for a particular traffic violation.  *Id*. § 703.002 art. III(b).  It would appear that a seat belt violation is not such an offense and that Maryland is a "party jurisdiction" to the NVC.

[6]Castro disputes that the decision to arrest was made prior to his refusal to allow Nettles to search the Suburban.

[7]The government maintains that Gomez was not placed under arrest at this time. Rather, she was transported to the Sheriff's Department so that she could use the restroom.

5

Vicencio were cited or ticketed for the seat belt violation. No inventory search of the Suburban was conducted by the Polk County Sheriff's personnel.

Castro, Vicencio, and Gomez were indicted by a federal grand jury on one count of conspiracy to possess cocaine with the intent to distribute, in violation of 21 U.S.C. § 846, and one count of possession with the intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1). Both Castro and Gomez filed motions to suppress the cocaine as illegally seized evidence. After a suppression hearing the district court denied the motions. Castro and Gomez pled guilty to both charges, reserving their right to appeal the denial of the motions to suppress. The district court sentenced Castro and Gomez to concurrent terms of 135 months imprisonment, and a five year term of supervised release. Both timely appealed.[8]

## ANALYSIS

We employ a two-tiered standard in reviewing the denial of a motion to suppress. We first review the factual findings for clear error and then review the trial court's ultimate conclusion as to the constitutionality of the law enforcement action *de novo*.[9] Our holding today turns on the latter.

The admissibility of the cocaine hinges on the validity of taking possession of the Suburban for purposes of an inventory search. An inventory search is a well-defined exception to the warrant requirement of the fourth amendment to the

---

[8]Vicencio is not a party to this appeal.

[9]**United States v. Chavez-Villarreal**, 3 F.3d 124 (5th Cir. 1993).

6

United States Constitution.[10] It is a search of property lawfully seized and detained. Such searches are conducted in order to protect the property that has been lawfully seized, to protect the police against claims of lost or stolen property, and to protect the police from potential danger.[11]

An inventory search is permitted and is deemed reasonable only if conducted according to standardized procedures.[12] More importantly, an inventory search is reasonable and lawful only if conducted for purposes of an inventory and not as an investigatory tool to produce or discover incriminating evidence.[13] An inventory search may not be used by police as a "ruse for a general rummaging."[14] If police use an inventory search in such a manner, any evidence discovered during the course of that search is subject to suppression.

Applying these rubrics to the taking into possession and search of the Suburban convinces us that the cocaine discovered must be suppressed. The Constitution clearly mandates such a result. We entertain no doubt that the search of the Suburban was conducted for investigatory rather than protective administrative purposes. We can reach no other reasonable legal conclusion on the

---

[10]**Colorado v. Bertine**, 479 U.S. 367 (1987); **South Dakota v. Opperman**, 428 U.S. 364 (1976).

[11]**Opperman**, 428 U.S. at 369.

[12]**Bertine**, 479 U.S. at 374 n.6 ("Our decisions have always adhered to the requirement that inventories be conducted according to standardized criteria.").

[13]**Florida v. Wells**, 110 S.Ct. 1632 (1990).

[14]*Id*. at 1635.

record before us.  The Polk County search was not a lawful search.

Castro and Gomez were the focus of a massive effort by numerous federal and local drug enforcement agents to uncover evidence of illegal drug activity.  The agents conducting the surveillance of Castro and Gomez followed them first through the City of Houston and, finally, through several Texas counties.  At no time did either Castro or Gomez do anything that conceivably could have served as the basis for a finding of probable cause of a drug violation.  Consequently the agents obviously concluded that they were not able to make a legal stop or arrest of Castro or Gomez for any drug related violation.  If these numerous federal and state law enforcement agents had, or believed that they had, probable cause to arrest, it defies all logic and reason to believe they would not have done so during the early surveillance or at some time in the 100-plus miles of trailing through several Texas counties.

Instead, the agents orchestrated a routine traffic stop,[15] contacting a local deputy sheriff and instructing him to "create his own probable cause."  The deputy sheriff did as instructed and, while the agents stood by and watched, ostensibly arrested Castro and Vicencio for a seat belt violation.[16]  When Castro refused to consent to a search of the Suburban, the deputy sheriff took possession of it, presumably to safeguard its contents while Castro and Vicencio were in custody on

---

[15]A pretextual traffic stop does not violate the fourth amendment.  *See* **Whren v. United States**, 116 S.Ct. 1769 (1996).

[16]As discussed *supra* in footnote 5, the legality of this arrest remains to be determined.

the seat belt violation. None of the occupants of the Suburban was cited for that traffic violation -- no ticket was issued and no charges were filed.

Further, no inventory search was ever undertaken at the Polk County sally port. Prior to any deputy sheriff commencing an inventory search, a drug dog was summoned. The drug dog alerted, a search was made as a consequence thereof, and the cocaine was discovered. The occupants of the Suburban and the Suburban then were taken from Polk County to Houston. The contents of the Suburban ultimately were inventoried in Houston.

We are persuaded that a routine inventory search -- conducted for the sole purpose of legitimately creating an accurate inventory of the contents of a vehicle -- would not immediately be preceded by such an obvious attempt to discover the incriminating evidence of which the deputy sheriff initially had been advised. We perforce must conclude that taking possession of the Suburban for purposes of an inventory search was nothing more than a ruse to perform an unauthorized search and the officers, particularly the federal officers, were fully aware of such. The cocaine discovered as a result of the search of the Suburban must be and is suppressed.

For the foregoing reasons, we VACATE the convictions of Castro and Gomez, suppress the evidence obtained in the illegal search of the Suburban, and REMAND to the district court for further proceedings consistent herewith.

ENDRECORD

DeMOSS, Circuit Judge, dissenting:

I cannot agree with my distinguished colleagues that the 900 pounds of cocaine seized in this case must be suppressed under the Fourth Amendment. I write to express the reasons for my disagree-ment.

As an initial matter, the majority fails to give proper deference to the findings of fact made by the district court in the 48-page memorandum explaining its decision to deny the motion to suppress. This is evident throughout the majority's opinion, where time and time again the facts of this case are characterized in a manner that contravenes the express findings of the district judge. In its memorandum opinion, the district court found that the Suburban exceeded the posted speed limit. Yet, the majority examines anew the accuracy and credibility of that determination:

> Nettles testified at the suppression hearing that he did not use his radar unit to clock the speed of the Suburban because he was afraid that to do so would "tip off" the driver of the Suburban about his presence. Nettles did not explain, however, why using the radar unit would be any more conspicuous than his presence in a marked patrol car on the median. In addition, Nettles conceded that his speedometer had not been calibrated in over three years.

(Majority Opinion at 4 n.3.) Similarly, without any justification the majority casts doubt on the factual basis for the district judge's finding that the stop and arrest were lawful: "As the Suburban approached, Nettles *claims* to have observed that the driver was not wearing a seat belt and that the Suburban *appeared* to be exceeding the speed limit." (Emphasis added.) In what is perhaps the most telling example of the majority's disregard for the findings of the district court, the

majority states without explanation that "the legality of the arrest remains to be determined." (Majority Opinion at 10 n.16.)

The district court's findings in this case clearly warrants the deference which we are required to give them under our Rules. It is evident from the length of the suppression hearing (almost two days), and the comprehensiveness of the district court's memorandum opinion (48 pages), that the district judge's decision was not a hip shot made without full and adequate consideration of the record. Indeed, the district judge viewed the witnesses at the suppression hearing and, after assessing "their demeanor, forthrightness, candor or lack thereof, the conflicts and apparent conflicts in their testimony," made the following findings:

> I conclude and find that on November 9, 1996, at 5:40 p.m., defendant Castro was exceeding the posted speed limit, was not wearing a seat belt, and that Vicencio, the front seat passenger, was not wearing a seat belt. I find the stop was lawful, the arrest of Castro and Vicencio were lawful, that Mrs. Gomez was not under arrest until after the discovery of the cocaine in Castro's vehicle.

In questioning these findings, the majority makes no attempt to show that they are "clearly erroneous," or otherwise unworthy of deference. Overlooked as well are two Texas cases that squarely hold that drivers and passengers are subject to arrest for seatbelt offenses. *Valencia v. State*, 820 S.W.2d 397, 399 (Tex. App.-Houston [14th Dist.] 1991, writ ref'd); *Madison v. State*, 922 S.W.2d 610, 612 (Tex. App.-Texarkana 1996, writ ref'd).

## I. The Stop & Arrest

11

Throughout its opinion, the majority places a great deal of emphasis on the events that preceded the stop and arrest of the defendants.

> Castro and Gomez were the focus of a massive effort by numerous federal and local drug enforcement agents to uncover evidence of illegal drug activity. The agents conducting the surveillance of Castro and Gomez followed them first through the City of Houston and, finally, through several Texas counties. At no time did either Castro or Gomez do anything that conceivably could have served as the basis for finding probable cause of a drug violation . . . . If these numerous federal and state law enforcement agents had, or believed that they had, probable cause to arrest, it defies all logic and reason to believe they would not have done so during the early surveillance or at some time in the 100-plus miles of trailing through several Texas counties.

> Instead, the agents orchestrated a routine traffic stop, contacting a local deputy sheriff and instructing him to "create his own probable cause." The deputy sheriff did as instructed and, while the agents stood by and watched, ostensibly arrested Castro and Vicencio for a seat belt violation.

In so doing, the majority implicitly suggests that the lawfulness of the stop and arrest are somehow dependent on the motives of the federal agents and Deputy Nettles. However, the Supreme Court has made clear that the subjective intentions of police officers "play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 116 S. Ct. 1769, 1774 (1996). Consequently, the suspicions of the federal officers who followed the Suburban, and the subjective beliefs of Deputy Nettles, have no bearing on the lawfulness of the stop and arrest. Absent compelling evidence to the contrary (which is not present in this case), we are bound by the district judge's findings that the stop and arrest were lawful under

12

the Fourth Amendment.

## II. The Impoundment of the Suburban

Given that the Suburban was lawfully stopped, with Castro and Vicencio lawfully under arrest at the side of the highway, the issue becomes what, if anything, transpired after the stop and arrest that violated the Fourth Amendment.

The majority states that "[t]he admissibility of the cocaine hinges on the validity of taking possession of the Suburban for purposes of an inventory search." (Majority Opinion at 7.) Assuming arguendo this to be true, the record in this case does not demonstrate that the defendants carried their burden of showing that the impoundment of the Suburban was pretextual. *See United States v. Kelley*, 981 F.2d 1464, 1467 (5th Cir.), *cert. denied*, 508 U.S. 944 (1993) (holding that the proponent of a motion to suppress has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of the Fourth Amendment).

In *Colorado v. Bertine*, 479 U.S. 367 (1987), the Supreme Court addressed the discretionary power of the police to impound a suspect's car pursuant to the inventory search exception. The Supreme Court explained that:

> Nothing . . . prohibits the exercise of police discretion so long as that discretion is exercised according to standard criteria and on the basis of

> something other than suspicion of evidence of criminal activity. Here, the discretion afforded the [] police was exercised in light of standardized criteria, related to the feasibility and appropriateness of parking and locking a vehicle rather that impounding it.

*Id.* at 375.

In the present case, the majority places great weight on the fact that the federal agents who trailed the Suburban were suspicious of illicit drug activity, but did not have probable cause to stop the vehicle themselves. The majority seems particularly concerned with the fact that the federal agents advised Deputy Nettles that he would have to "develop" his own probable cause.

But the critical issue is not whether the facts of this case give rise to a vague notion that the suspicions of the federal agents influenced Deputy Nettles' decision to stop and arrest the defendants. As discussed earlier, pretext cannot be used to challenge the lawfulness of a stop or arrest that is otherwise supported by probable cause. The question for decision, as framed by the majority, is whether the decision to impound the Suburban was pretextual, or made in bad faith. As to that precise

14

inquiry, the majority opinion is conspicuously silent.

Nowhere in the majority opinion is there mention of evidence that the impoundment of the Suburban violated "standardized criteria" of the Polk County Sheriff's Department. Also absent is any mention as to who directed Officer Reeves to drive the vehicle to the impound lot, or why that decision was made. Indeed, there is nothing to indicate whether this issue was even raised in the district court. Nevertheless, the majority leaps to the conclusion that the impoundment was pretextual without any specific evidence to that effect.

### III. The Sniff & Search

Once we accept that the stop and arrest were lawful, and that there is insufficient evidence to reasonably question the legality of the impoundment, the next fact finding by the district judge becomes critical to a proper resolution of this case:

> There was no search or entry made into Castro's vehicle until Trooper Pitts' narcotics dog alerted on the rear and side door of the Suburban, and that the search was lawful, both as to the inventory

15

requirement and that probable cause existed before Castro's vehicle was searched.

This finding is important because our Court has clearly held that a drug-sniffing dog's sniff does not constitute a search under the Fourth Amendment. *United States v. Seals*, 987 F.2d 1102, 1106 (5th Cir.), *cert. denied*, 510 U.S. 853 (1993). Thus, no constitutional violation occurred in this case when the deputy sheriff and DPS officer decided to "smell test" the exterior of the Suburban. Furthermore, our Court has held that a drug-sniffing dog's alert to the possible presence of narcotics constitutes sufficient probable cause to suspect that a vehicle contains contraband to permit a warrantless search. *United States v. Williams*, 69 F.3d 27, 28 (5th Cir. 1995), *cert. denied*, 116 S. Ct. 1284 (1996). Therefore, once the drug-sniffing dog alerted in our case, the police had probable cause to believe that the Suburban contained drugs and, therefore, had sufficient cause to search the vehicle without a warrant under the automobile exception. *United States v. Zucco*, 71 F.3d 188, 191-92 (5th Cir. 1995), *cert. denied*, 117 S. Ct. 91 (1996).

Accordingly, the critical issue in this case is not

16

"the validity of taking possession of the Suburban for purposes of an inventory search" as the majority frames it; but whether Castro's and Gomez's Fourth Amendment rights were violated when (1) the deputy sheriff used the drug-sniffing dog to sniff the exterior of the vehicle, or (2) the officers searched the Suburban on the dog's alert.  Clearly, both questions must be answered in the negative.

It is important to note that the search that produced the 900 pounds of cocaine was based upon probable cause resulting from the alert of the drug-sniffing dog.  That search was not an "inventory search" and, therefore, the majority's extended discussion of what is, or is not, an appropriate inventory search is not determinative of the critical issue in this case.  Surely, if Trooper Pitts and his dog had been able to come to the scene of the highway stop, and had the dog alerted there to the presence of drugs, the validity of the search and seizure would be unquestionable.  Likewise, if Officer Nettles had decided to conduct an inventory search of the Suburban on the side of the highway, which he certainly would have been authorized to do, that search also would

17

have revealed the contraband.  But the side of a heavily trafficked highway is not a  safe or appropriate place to conduct an inventory search of any vehicle.  Officer Nettles' decision to take the Suburban into custody by moving it to the Polk County sheriff's compound before performing the inventory search was a reasonable exercise of  police discretion.  This is especially true given the fact that the Suburban was a rental car that obviously belonged to another party, and contained a substantial amount of luggage and cargo that would have to be removed to be properly inventoried.

## IV.   The Nonresident Violator Compact

Finally, I must take issue with the majority's discussion of the Nonresident Violator Compact ("NVC"). The NVC issue was not raised in the suppression hearing before the district court.  Castro and Gomez raised the applicability of the NVC to their arrests for the first time on appeal.  Therefore, any error resulting from the district court's failure to apply the NVC must  be reviewed for plain error only.  *See* Fed. R. Crim. P. 52(b).

The NVC, which was adopted by the Texas Legislature in 1977, has never been cited by any Texas court; nor by any court from the States of Louisiana or Mississippi that have passed similar NVC statutes; nor by any United States District Court in the States of Texas, Louisiana or Mississippi; nor by any decision of this Court. Consequently, there are no published decisions of any court construing the NVC as limiting the authority of a state police officer to make an arrest of a nonresident. That was true at the time of trial, and is equally true now, as the case is pending before us on appeal. Under my reading of the NVC, I would conclude that there was no error with regard to the seatbelt violation arrests. Even assuming, however, that such arrests were error, it is impossible to say that such error was clear at the time of the suppression hearing or at the time of this appeal.

The majority, however, makes no attempt to satisfy the elements of our plain error rule and professes in footnote 5 that it does not "now answer" the question as to the applicability of the NVC. But in footnote 16 the majority clearly indicates that the legality of the

19

arrest in this case "remains to be determined." In effect the majority is implying that there may be a problem with the validity of the arrest in this case. As I indicated earlier, however, the Texas law is very clear that a citizen of Texas may be arrested for not complying with the seatbelt law. *See* **Valencia** and **Madison**, *supra*, at 2-3. And no case exists which interprets the NVC as requiring that a non-resident be given different treatment.

For the foregoing reasons, I would affirm the district court's decision to deny Castro's and Gomez's motion to suppress the evidence seized in the Suburban.