United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 30, 2003**

Charles R. Fulbruge III
Clerk

REVISED JUNE 16, 2003

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

**No. 01-50858**
_____

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**versus**

**LEE ARTURO CHACON,**

**Defendant-Appellant.**

_____

Appeal from the United States District Court
for the Western District of Texas

_____

Before GARWOOD, JONES and STEWART, Circuit Judges.

EDITH H. JONES, Circuit Judge:

After appellant Chacon conditionally pled guilty to possession with intent to distribute less than 50 kilograms of marijuana following the denial of his motion to suppress evidence, he was sentenced _inter alia_ to ten months of imprisonment. On appeal, he challenges the district court's denial of his motion to suppress evidence. Although this case appears to be distinguishable from the court's recent decision in <u>United States</u>

v. Portillo-Aguirre, 311 F.3d 647 (5th Cir. 2002), we must remand for further findings to ascertain, inter alia, whether the Border Patrol officer had not completed his immigration inspection when, on his way out of the bus, he stopped and asked Chacon and his companion some questions.

At the evidentiary hearing concerning the motion to suppress, Senior United States Border Patrol Agent Jay Woodruff, a five-year veteran of the Border Patrol, testified generally concerning the legendary Sierra Blanca, Texas, immigration checkpoint. The checkpoint is located on IH-10 approximately 87 miles east of El Paso, Texas and only six or seven miles from the Rio Grande River. The Sierra Blanca checkpoint is a permanent steel structure with primary and secondary inspection areas. It is open 24 hours a day, and each vehicle receives some inspection unless there is bad weather or unusual traffic congestion. Approximately three hundred arrests are made for immigration violations and approximately 25 to 30 arrests are made for narcotics violations at the checkpoint each month.

More than a dozen buses a day pass through the checkpoint. All buses stop in the secondary inspection area so that agents can check the immigration status of the passengers and perform an inspection of the bus for narcotics. The bus driver unlocks the lower luggage bin for canine inspection of the luggage. Agents spend about five minutes, on average, checking the occupants of a bus at the checkpoint. Agent Woodruff generally boards a bus,

identifies himself, and asks the passengers to have their identification, passports, or visas ready if they are not United States citizens. In addition to talking with the passengers while he checks their citizenship, he observes their behavior to determine whether they are concealing anything and how they feel about his presence on the bus. After checking the passengers' immigration status, the agents usually check the bathroom for narcotics. On the way back to the front of the bus, Agent Woodruff sometimes will talk to passengers and look into matters which may have attracted his attention or aroused his suspicion. Agent Woodruff testified that sometimes he makes an incorrect decision concerning citizenship and, after speaking to the passenger again, his suspicion is allayed. Agent Woodruff also observes the luggage under the seats as he is walking from the back to the front of the bus.

On November 6, 2000, at approximately 10:15 p.m., an Americanos bus that originated in El Paso arrived at the checkpoint. When the bus stopped at the secondary inspection area, Agent Woodruff went aboard, introduced himself, and asked everyone to present personal identification. There were only a few passengers on the bus. Julio Carrillo, a juvenile, and Chacon were sitting together about half way down the aisle. Carrillo was sitting in the aisle seat, and Chacon was sitting in the window seat. When Agent Woodruff asked them about their citizenship, they spoke English and responded that they were U.S. citizens. Agent

3

Woodruff testified that they did not respond with a simple "yes," and it seemed that the question concerning their citizenship was confusing to them, but "[t]hey both established to me that they were U.S. citizens." Agent Woodruff then inspected the bathroom for hidden narcotics.

As he proceeded back down the aisle, Agent Woodruff testified, he was trying to figure out why the conversation with Carrillo and Chacon was awkward, and he returned to ask them a few additional questions to determine whether they were concealing something or whether he had made a wrong decision concerning their citizenship. He further stated, "I figured before I asked for consent of the bags [sic], I'll talk to them a little while longer and establish maybe a little more suspicion." On cross-examination, Chacon's lawyer tried to establish that Woodruff had completed his immigration questioning and was at this point suspicious only of drug trafficking. Woodruff, however, denied this implication, stating twice that he was still also wondering if he had made a wrong decision on immigration.[1]

---

[1] Perhaps his clearest statement of his intent at this point is as follows:

A. When I finished with them, in my mind, I'm going on to the next person and in my mind I'm wondering to myself why this conversation was awkward. Did I maybe make a wrong decision about the immigration status? Did they fool me or what the deal is. Okay? As I return, I see the bags and so in my mind now, maybe I am right about the immigration, maybe it is drugs, I don't know. So, I make additional inquiries with these two subjects.

In response to Agent Woodruff's question, Carrillo gestured toward Chacon and stated that they were traveling from El Paso to Dallas, Texas. Chacon verified that he was traveling with Carrillo. Agent Woodruff then asked if they had any luggage. Chacon stated that he had some bags containing clothes in the lower luggage compartment.

Carrillo stated that he had bags under his seat and under Chacon's seat. Agent Woodruff asked if he could see inside of the bags, and Carrillo consented and pulled out the bags. Carrillo stated that the bags contained clothes. Agent Woodruff testified that the bags felt heavier than bags containing just clothes; when he moved a shirt, a tape-wrapped bundle fell out of the shirt. Agent Woodruff asked Chacon what the bundle was, and Chacon just shrugged. Making a small incision in the bundle with his knife, the agent found marijuana. Carrillo and Chacon were escorted off of the bus with their bags. Agent Woodruff discovered about nine pounds of marijuana in four bundles in Carrillo's bags. He arrested both Carrillo and Chacon.

Border Patrol Agent David Guajardo testified Chacon was interviewed by Border Patrol Agent Mayfield. Chacon admitted that he knew the marijuana was in the bags, and that he had made arrangements with a man named Panzas in Dallas to sell the marijuana for $400 a pound.

## DISCUSSION

5

Chacon asserts that the district court erred in denying his motion to suppress the evidence and the statements he made following his arrest. He contends that after Agent Woodruff initially questioned him and Carrillo concerning their citizenship, the agent did not have reasonable suspicion to extend Chacon's detention with further questioning. Chacon also argues that the agent did not have probable cause to arrest him merely because he was traveling with Carrillo, who had marijuana hidden in his carry-on luggage.

When analyzing a ruling on a motion to suppress, this court reviews questions of law de novo and findings of fact for clear error. United States v. Castro, 166 F.3d 728, 731 (5th Cir. 1999) (en banc). Moreover, this court may uphold the denial of a motion to suppress if there is any reasonable view of the evidence to support it. United States v. Gonzalez, 190 F.3d 668, 671 (5th Cir. 1999).

Border Patrol agents stationed at a permanent checkpoint may stop a vehicle, question its occupants about citizenship, and conduct a visual inspection of the vehicle without any individualized suspicion that the vehicle or its occupants is involved in a crime. United States v. Martinez-Fuerte, 428 U.S. 543, 556-62 (1976); United States v. Hernandez, 976 F.2d 929, 930 (5th Cir. 1992). Referral of vehicles to a secondary inspection area is also permissible under the Fourth Amendment, even in the absence of any individualized suspicion. Martinez-Fuerte, 428 U.S.

6

at 563-64; <u>Hernandez</u>, 976 F.2d at 930.  Border Patrol agents may also make referrals to secondary inspection to conduct inquiries about controlled substances.  <u>Hernandez</u>, 976 F.2d at 930 (citing <u>United States v. Dovali-Avila</u>, 895 F.2d 206, 207 (5th Cir. 1990)).

A Border Patrol agent may extend an immigration stop to search for drugs so long as this extension is based upon "consent or probable cause."  <u>Martinez-Fuerte</u>, 428 U.S. at 567; <u>United States v. Machuca-Barrera</u>, 261 F.3d 425, 434 (5th Cir. 2001).  "Also, if the initial, routine questioning generates reasonable suspicion of other criminal activity, the stop may be lengthened to accommodate its new justification.  Thus, an agent at an immigration stop may investigate non-immigration matters beyond the permissible length of the immigration stop if and only if the initial, lawful stop creates reasonable suspicion warranting further investigation."  <u>Id</u>. at 434.  "The key is the rule that a[n immigration] stop may not exceed its permissible duration unless the officer has reasonable suspicion."  <u>Id</u>.

After thoughtfully analyzing the governing caselaw from the Supreme Court and this circuit up to the date of its decision, and finding this to be an extremely close case, the district court held that Agent Woodruff "was able to articulate specific facts that warrant reasonable suspicion that suspicious circumstances

7

were afoot."[2] Thus, the agent was permitted constitutionally to "continue the seizure" of Chacon and the juvenile long enough to question them about their luggage and obtain consent to search. The district court also noted the agent's testimony that he continues to observe passengers and their luggage for suspicious activity as he moves through the bus, even after he initially questions them. The district court did not rule on probable cause to arrest Chacon.

Chacon principally argues that Agent Woodruff had completed his immigration inquiries by the time he asked Chacon and Carrillo two follow-up questions while returning from the back to the front of the bus. On this basis, Chacon argues that Woodruff's additional questions unconstitutionally extended the detention of the bus on subjects not germane to the checkpoint's principal immigration control purpose and for which the agent had no reasonable suspicion. A panel of this court recently held that "if an agent does not develop reasonable suspicion of [criminal] activity before the justifying purpose of a checkpoint stop has been accomplished, he may not prolong the stop." United States v. Portillo-Aguirre, 311 F.3d at 657.

---

[2] These circumstances included the awkwardness and difficulty of his initial conversation with the passengers, the frequency of narcotics smuggling on commercial buses, and the presence of several pieces of luggage under their seat. The court pointed out that reasonable suspicion need not rise to the level of probable cause.

There are similarities between <u>Portillo-Aguirre</u> and this case – the identical checkpoint, the late evening arrival of commercial bus passengers, the identity and practices of Agent Woodruff, the interrogation followed by a consent search that led to the discovery of the illegal drugs, even the same federal judge. Moreover, just as in this case, Agent Woodruff was walking from the rear to the front of the bus when he was provoked to additional questioning of Portillo. In <u>Portillo-Aguirre</u>, denial of a suppression motion was reversed.

We conclude, however, that <u>Portillo-Aguirre</u> does not establish an inflexible rule concerning immigration checkpoints that limits agents to one set of questions. <u>Portillo-Aguirre</u> rests on this court's previous discussion in <u>United States v. Machuca-Barrera</u>, <u>supra</u>, which rejected defendants' motions to suppress evidence. In <u>Machuca-Barrera</u>, the defendants' marijuana smuggling was discovered after they were stopped at an immigration checkpoint and were asked, among other questions, whether they were carrying firearms or drugs. <u>Id.</u> at 430. The court stated:

> An officer may ask questions outside the scope of the stop, but only so long as such questions do not extend the duration of the stop. It is the length of the detention, not the questions asked, that makes a specific stop unreasonable: The Fourth Amendment prohibits only unreasonable seizures, not unreasonable questions . . . .

Id. at 432 (footnotes omitted).³  Although this court set no specific upper time limits applicable to immigration-related stops at border patrol checkpoints, the court stated:

> The permissible duration of the stop was the amount of time reasonably necessary for [the border patrol agent] to ask a few questions about immigration status. [The agent's] few questions took no more than a couple of minutes; this is within the permissible duration of an immigration checkpoint stop.

Id. at 435.  This court emphasized that it would not scrutinize the particular questions a border patrol agent asks as long as they relate generally to determining citizenship status.  Id. at 433.

Viewed in light of Machuca-Barrera, Portillo-Aguirre represents a situation in which the agent conceded his immigration inspection had ended before, on moving from the back to the front of the bus, he developed reasonable suspicion that Portillo and his wife might be transporting illegal drugs.  Portillo-Aguirre does not constrain immigration agents to making an irrevocable decision, on their first encounter with bus passengers, about the passengers' immigration status.  Further, because an agent who boards a bus to investigate the passengers must necessarily disembark, the reasonable length of the detention ordinarily includes his walking down the aisle to the front door.  The agent may continue to ask

---

³  This court has also recently held that illegal drug interdiction may be carried out at immigration checkpoints, though not as the primary purpose of those checkpoints.  United States v. Moreno-Vargas, 315 F.3d 489 (5th Cir. 2002), cert. denied, ___ S.Ct. ___, 2003 WL 1339035 (2003).

questions of the passengers during this exit passage so long as he still has immigration-related motives in mind.

Here, for instance, the agent's testimony suggests that he remain concerned about the initial encounter with Chacon and Carrillo, specifically about whether the awkward conversation implied that they were concealing something, whether immigration or other violations. Twice he testified that he wondered whether he might be wrong about his earlier satisfaction as to their immigration status. His follow-up questions are not inconsistent with the desire to allay this uncertainty, even if they had a dual purpose that could lead to the discovery of contraband. (For instance, whether the travelers were carrying luggage could relate to their immigration status.) From the agent's testimony in this case, it might be found that the purpose of the immigration stop had not ended when he posed additional questions to Chacon.

Moreover, even if the inquiries related to illegal drugs, Machuca-Barrera holds them permissible so long as they were made during the reasonable length of an immigration detention. Here, there is no evidence that Agent Woodruff's follow-up questions unduly prolonged the detention of the bus. Since the agent was entitled to continue questioning Chacon and Carrillo in order to resolve his uncertainty about their immigration status, and since it is "the length of the detention, not the questions asked, that makes a specific stop unreasonable . . ." Machuca-Barrera, 261 F.3d at 432, the agent's questions could not violate the Fourth

11

Amendment. See also United States v. Shabazz, 993 F.2d 431, 436 (5th Cir. 1993) ("we reject any notion that a police officer's questioning, even on a subject unrelated to the purpose of the stop, is itself a Fourth Amendment violation.")[4]

As we have noted, however, the district court made no explicit finding whether Agent Woodruff had or had not completed his immigration inquiries of Chacon and Carrillo as he walked from the rear to the front of the bus (or whether the bus's immigration detention was then unduly prolonged). This lapse is hardly to be faulted. Neither Machuca-Barrera nor Portillo-Aguirre had been decided and put this issue in perspective at the time the court ruled. Moreover, this issue is antecedent to the question actually decided by the district court, i.e. whether reasonable suspicion of criminal activity existed if the immigration purpose of the step had been completed. The district court also failed to address Chacon's argument that Agent Woodruff lacked probable cause to arrest him simply because he was traveling with a juvenile who was carrying marijuana in his baggage.

---

[4]     Chacon has no standing to question the sufficiency of Carrillo's consent to search Carrillo's luggage where the marijuana was found.

## CONCLUSION

For the foregoing reasons, we remand to the district court to obtain additional findings. The amended opinion will then be returned to this panel for further consideration.

**REMANDED** with **INSTRUCTIONS**.


ENDRECORD

CARL E. STEWART, Circuit Judge, specially concurring:


I agree with the majority that this case should be remanded because the district court did not determine: (1) whether the immigration stop was complete when Agent Woodruff began his second round of questioning of Chacon and his companion, and (2) whether there was probable cause to arrest Chacon. I write separately because I find the majority's discussion of the mindset of the officer and the limitations of this Court's decision in Portillo-Aguirre unnecessary to our decision at this time. The district court's answer to the first question, which it understandably did not make because Portillo-Aguirre and Machuca-Barrera had not been decided at that time, is key to resolving this case. If the district court finds that the immigration stop was not complete, then and only then, will it be necessary for this Court to expound on the motivations behind Agent Woodruff's actions and the interpretation of Portillo-Aguirre and other relevant case law. Moreover, depending on the district court's probable cause determination, the outcome of this case could change dramatically.

In short, I agree that the case must be remanded in order for the district court to determine these critical determinations, but I do not join in the opinion's advisory discussion of the limits of Portillo-Aguirre, the possible motivations and

14

ramifications of Agent Woodruff's behavior, and its premature finding that Agent Woodruff's questioning of Chacon and his companion could not violate the Fourth Amendment.