United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 20, 2006**

Charles R. Fulbruge III
Clerk

REVISED MAY 10, 2006
IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 04-41524
Summary Calendar

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

LEONEL VENTURA,

Defendant-Appellee.

Appeal from the United States District Court for
the Southern District of Texas
(USDC No. 5:04-CR-1436-ALL)

Before REAVLEY, HIGGINBOTHAM and CLEMENT, Circuit Judges.

REAVLEY, Circuit Judge:

The Government appeals the district court's grant of defendant Leonel Ventura's

motion to suppress evidence of marijuana discovered in the exterior luggage bin of a

commercial bus during an immigration checkpoint stop. We reverse.

I.

1

Leonel Ventura was a passenger on a commercial bus that arrived at a fixed immigration checkpoint on Interstate 35 near Laredo, Texas in the early morning hours of June 21, 2004.  Routinely, two Border Patrol agents would perform bus inspections, with one agent questioning the passengers and inspecting the restrooms for concealed persons and drugs, while the other used a canine to sniff the bus and run through the exterior luggage compartment, where hidden undocumented aliens were often discovered.  Because Ventura's bus arrived at 12:30 a.m., at the moment an agent shift change occurred, Agent Ian Clevenger, a canine handler, was the only agent available to conduct the immigration inspection of the bus.

Agent Clevenger first entered the bus's passenger compartment and conducted an immigration inspection of the fifteen or so visible passengers, passing from front to back asking citizenship and requesting documents if necessary.  Ventura told the agent that he was going to San Antonio and returning later that day and that he had no luggage.  Agent Clevenger later recalled that he found it "kind of awkward" that somebody would be making such a brief round trip, but he did not question Ventura further.

After questioning the passengers and checking the restroom, Agent Clevenger left the bus, got his canine and, opening the undercarriage luggage bins, commanded the dog to get in and search.  The dog, which was trained to detect both concealed people and narcotics, alerted to two bags.  Agent Clevenger later testified that approximately three and one-half minutes elapsed between the time he began his questioning of the bus's passengers and the time the dog alerted in the luggage compartment.

2

Agent Clevenger got back on the bus and asked all the passengers to claim their luggage. After this process, one of the two bags to which the dog had alerted remained unclaimed. The bus driver declared the bag abandoned and Agent Clevenger opened it, discovering three bundles of marijuana inside. The claim ticket on the bag revealed that it had been loaded onto the bus in Laredo where, the passenger manifest revealed, Ventura was one of only two people who had boarded. Ventura consented to being searched and Agent Clevenger found the matching claim ticket to the offending bag in Ventura's shoe.[1] The drug possession charges underlying this case followed.

Ventura moved to suppress the drug evidence on the grounds that the drug evidence against him was the fruit of an illegally extended seizure. The district court granted Ventura's motion and the Government appeals.

II.

When analyzing a ruling on a motion to suppress, this court reviews questions of law *de novo* and findings of fact for clear error. *United States v. Portillo-Aguirre*, 311 F.3d 647, 651-52 (5th Cir. 2002). In our review, we must view the evidence in the light most favorable to Ventura, as the party that prevailed below. *United States v. Ellis*, 330 F.3d 677, 679 (5th Cir. 2003).

III.

In *United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S. Ct. 3074 (1976), the

---

[1] The second bag was claimed by Ventura. That bag was searched later, after Ventura's arrest, and no drugs were found inside.

Supreme Court upheld the constitutionality of immigration checkpoints at which government agents stop travelers without individualized suspicion for questioning about immigration status. We have recognized that the scope of such immigration checkpoint stops "is limited to the justifying, programmatic purpose of the stop: determining the citizenship status of persons passing through the checkpoint." *United States v. Machuca-Barrera,* 261 F.3d 425, 433 (5th Cir. 2001). "The permissible duration of an immigrant checkpoint stop is therefore the time reasonably necessary to determine the citizenship status of the persons stopped." *Id.* This includes the time necessary to ascertain the number and identity of the occupants of the vehicle, inquire about citizenship status, request identification or other proof of citizenship, and request consent to extend the detention. *Id.*

If the initial, routine questioning generates reasonable suspicion of other criminal activity, the stop may be lengthened to accommodate its new justification. *Id.* at 434. Thus, an agent at an immigration stop may investigate non-immigration matters beyond the permissible length of the immigration stop if the initial lawful stop creates a reasonable suspicion warranting further investigation. *Id.* Accordingly, illegal drug interdiction may be carried out at immigration checkpoints, though not as the primary purpose of those checkpoints. *Id.* at 431. In this vein, we have recognized that the use of drug-sniffing dogs at immigration stops is permissible so long as such use does not lengthen the stop beyond the time necessary to verify the immigration status of a vehicle's passengers. *United States v. Garcia-Garcia,* 319 F.3d 726, 730 (5th Cir.

4

2003).

IV.

While Ventura does not challenge the legality of the initial immigration stop, he argues that the agent violated his Fourth Amendment rights by extending the detention to conduct a search for drugs, after the lawful immigration purpose of the stop had terminated. Ventura contends that the legitimate immigration purpose of the checkpoint stop ended when Agent Clevenger, satisfied that all visible passengers aboard the bus were lawfully present in the country, exited the passenger compartment; and thus, Ventura was unlawfully detained without reasonable suspicion, probable cause, or consent, while the exterior luggage bins were inspected.

The Government responds that since agents routinely ran a trained canine through the exterior luggage compartment to detect any concealed persons, this action did not unlawfully extend the stop. The Government argues that, because detection and interdiction of concealed, undocumented aliens is just as much a part of the immigration inspection as questioning the visible passengers on a bus, the immigration purpose of the stop had not yet been completed at the time the dog alerted to luggage in the exterior bin.

The general question then is whether the Border Patrol agent unlawfully extended the immigration checkpoint stop beyond its permissible duration. Our inquiry as to the constitutionality of the stop's duration considers only Agent Clevenger's actions up to the point at which Ventura consented to a search of his person, as after the defendant consents, the agent needs no justification to prolong the encounter. *Machuca-Barrera*,

5

261 F.3d at 435. Ventura characterizes this inquiry as factual, relying on our decision in *United States v. Chacon*, 330 F.3d 323 (5th Cir. 2003). We disagree.

*Chacon* was remanded because the district court had not made an explicit factual finding as to whether the agent had completed his immigration inspection at the time further questioning aimed at drugs occurred. *Id.* at 329. However, in *Chacon* all of the actions of the agent in question took place in the passenger compartment of the commercial bus on which Chacon was riding. *Id.* at 325. Another agent was contemporaneously conducting the exterior luggage bin inspection. *Id.* Thus, the subjective inquiry as to when the top side agent was satisfied that the compartment contained only legal travelers was important to the determination of whether he switched his focus to drug interdiction after his immigration purposes were complete. Here, it is undisputed that Agent Clevenger had satisfied himself that the visible passengers riding on the top side of the bus were lawfully present in the United States but, absent a partner, he went on to inspect the exterior luggage bins himself.

We believe the inquiry in this case is broader, considering whether Agent Clevenger's general method of inspection passes constitutional muster. The legal question presented is whether an agent's satisfaction with the status of the visible passengers of a bus concludes the permissible scope of a checkpoint stop; or, in other words, whether the sweep for persons hidden in the exterior luggage compartment of a commercial bus is within the programmatic purpose of a Border Patrol checkpoint and concomitant immigration inspection.

6

V.

The Supreme Court has recognized that the principal problem with illegal immigration arises from surreptitious entries. *Martinez-Fuerte,* 428 U.S. at 552, 96 S. Ct. at 3080. *Martinez-Fuerte* specifically identified the smuggling of hidden aliens as a legitimate concern justifying the existence of fixed immigration checkpoints. *Id.* at 552, 556-57. The Sentencing Commission has specified such conduct as deserving of a sentence enhancement for reckless endangerment. U.S. SENTENCING GUIDELINES MANUAL § 2L1.1, cmt. n.6 (2005).

Policy considerations notwithstanding, Ventura asserts that, because the Supreme Court in *Martinez-Fuerte* stated that "the inspection of a vehicle is limited to what can be seen without a search" (429 U.S. at 558, 96 S. Ct. at 3083), the scope of a suspicionless immigration check is limited to the visible passengers in the bus. Ventura apparently concludes that, since the exterior luggage compartments are not readily visible, any inspection of those compartments is ancillary to the top side immigration check and must be completed before the quiz of the visible passengers is finished to avoid prolonging the detention. If the law were otherwise, Ventura asserts, the Border Patrol would be able to search every trunk and compartment in every vehicle that passed through the checkpoint, even if there were no reasonable suspicion that the travelers were engaged in illegal activity and no question as to their immigration status.

The district court recognized that Ventura's argument, carried to its logical conclusion,

7

would mean that a Border Patrol agent could never look in a bus restroom or in its baggage compartment. Such a restriction would seriously impair the efficacy of permanent checkpoint stops: if an illegal alien could escape detection by merely hiding in the bathroom, between the seats, or in a luggage bin, the inspection would be a mere farce.

The district court, while conceding its flaws, nonetheless appears to have been swayed by Ventura's "simultaneous with passenger quiz or not at all" rule for exterior luggage compartment sweeps, finding that the immigration-related purpose of the stop terminated when the passenger questioning was complete. We agree with the Government that Ventura's argument, and the result adopted by the district court, constitutes an incorrectly narrow view of the programmatic purpose of fixed immigration checkpoints and ignores the distinctions between private and commercial inspections.

## VI.

As we have recognized, "[p]assengers traveling on a commercial bus receive the same degree of constitutional protection and are subject to the same legitimate intrusions on their Fourth Amendment interests as those in private vehicles." *Portillo-Aguirre,* 311 F.3d at 652 (citing *Florida v. Bostick,* 501 U.S. 429, 438, 111 S. Ct. 2382 (1991)). However, the practical and legal realities of inspecting a commercial bus differ from inspections of private vehicles.

First, the sheer mechanics of immigration inspections of commercial buses and private vehicles are different. At the Interstate 35 checkpoint, as at most similar immigration checkpoints, all commercial buses are sent to a special lane for inspection, where an agent actually boards the vehicle and walks down the center aisle, observing all

open spaces and talking to passengers along the way.  It is not practical to literally apply the *Martinez-Fuerte* restriction on inspection to what and who agents can see and question while standing on the pavement.

More importantly to this case, *Martinez-Fuerte*'s limitation of suspicionless checkpoint inspections to visible spaces was premised on the privacy expectations of private motorists in their vehicles.  428 U.S. at 558-60, 96 S.Ct. at 3083.  Consistent with this limitation, Agent Clevenger testified that the Border Patrol does not open and search the luggage compartments of passenger cars unless there is reasonable suspicion to do so. Ventura had no reasonable expectation of privacy in the exterior luggage compartment of a commercial bus, and therefore no standing to contest the actual inspection of that compartment, to which the bus operator consented.  *See United States v. Hernandez-Zuniga*, 215 F. 3d 483, 487 (5th Cir. 2000) (recognizing that consent to search and seizure by controlling third party applies to immigration inspections of commercial buses).  Ventura's individual bag, in which he maintained an expectation of privacy at the time it was placed in the luggage bin, was not searched until the bag was determined to be abandoned.  *See United States v. Castro,* 129 F.3d 752, 758 (5th Cir. 1997)(citing *United States v. Seals*, 987 F.2d 1102, 1106 (5th Cir. 1993) (recognizing that a dog sniff is not a search within the meaning of the Fourth Amendment).

We have acknowledged and impliedly approved the routine sweep of commercial bus restrooms during immigration checkpoint stops as falling within the programmatic purpose of such stops.  *See, e.g., Portillo-Aguirre,* 311 F.3d at 650 (noting that the

9

agent's immigration inspection "included checking the bathroom at the back of the bus for illegal aliens or narcotics"); *Chacon*, 330 F.3d at 323 (same). We perceive no constitutional violation in the routine brief inspections of a bus's restrooms and undercarriage luggage bins for concealed aliens, so long as such sweeps do not unduly prolong the checkpoint stop. To hold otherwise would encourage illegal aliens and alien smugglers to conceal themselves and others in luggage, luggage compartments, engine compartments, and other unsafe places in commercial buses in an effort to circumvent the checkpoint inspection.

## VII.

For the reasons we have stated above, immigration checkpoint agents are entitled to sweep the restrooms and exterior luggage compartments of commercial buses so long as (1) during the time frame those checks are conducted, the primary purpose remains interdiction of illegal immigrants, and (2) the checks do not unreasonably prolong the duration of the stop. Here, nothing about Agent Clevenger's actions evinces a shift in the primary purpose of the stop from enforcing immigration laws to drug interdiction up until the time individualized suspicion arose. Agent Clevenger testified that his primary purpose for getting off the bus and checking the luggage bins was the interdiction of illegal immigration. He explained to the district court that he had found undocumented aliens concealed in such luggage compartments, as well as inside of boxes and suitcases on "many" prior occasions and that his canine was specifically trained to detect "[h]idden people, first and foremost." That Agent Clevenger and his dog were able to detect drugs

10

simultaneously with concealed persons does not offend *Martinez-Fuerte. Garcia-Garcia,* 319 F.3d at 730; *Portillo-Aguirre,* 311 F.3d at 649. Once the dog alerted, Agent Clevenger had sufficient reasonable suspicion to permit him to prolong the stop to explore further the potential source of the dog's alert. *Garcia-Garcia,* 319 F.3d at 730.

Since we have determined that the permissible duration of the stop was the amount of time reasonably necessary for agents to question the visible passengers and conduct brief checks of the bus's restrooms and undercarriage luggage bins, the final consideration is whether Agent Clevenger's lone conduct of all of these inspection components unreasonably extended the stop. We believe that it did not.

We have recognized that how an inspection is comported, i.e. the sequential steps taken by an agent or agents when conducting same, may bear on whether the permissible duration of an immigration stop has been exceeded. *Garcia-Garcia,* 319 F.3d at 730. However, we have declined to establish a set script of immigration questioning to which agents must adhere by rote, recognizing that, generally, it is the length of the detention, not the questions asked, that makes a specific stop unreasonable. *Chacon,* 330 F.3d at 327, 328; *Garcia-Garcia,* 319 F.3d at 729; *Machuca-Barrera,* 261 F.3d at 433-34.

We are likewise reluctant to impose an inflexible sequence of actions that all agents must follow in performing immigration inspections of commercial buses. Given the gravity of its mandate, we are loath to dictate to the Border Patrol how to deploy its limited resources and accomplish its legitimate mission. Circumstances vary and agents must retain the flexibility to perform their statutory duties effectively, so long as they do

11

so within constitutional parameters.

That Ventura's bus happened to arrive at the moment a shift change occurred, such that one agent consecutively (rather than two agents concurrently) conducted the upper and lower compartment inspections, does not change the programmatic, and therefore legal, nature of the stop. There is no evidence that a single agent performing the inspections of both levels unduly prolonged the detention of the bus. The chain of events leading to the canine alert, which in total lasted only a few minutes, lasted no longer than necessary to fulfill the stop's immigration-related purposes and, thus, the detention did not violate the Fourth Amendment.

## VIII. Conclusion

The Fourth Amendment and the case law of the Supreme Court and this circuit permit Border Patrol Agents at fixed checkpoints to take the reasonable time necessary to determine the number and citizenship of the individuals passing through the checkpoint. The immigration purpose of such checkpoints is not necessarily complete when an agent becomes satisfied as to the immigration status of the visible occupants of a commercial bus's passenger compartment. Agents are entitled to briefly check for concealed persons in the bus's other common areas, including the restrooms and undercarriage luggage bins, so long as the concomitant detention of the bus and its passengers is brief and reasonable.

Up to the time the canine alerted, at which time reasonable suspicion to extend the stop to look for drugs arose, Agent Clevenger's actions neither strayed from the programmatic purpose of the stop — interdiction of illegal immigrants — nor unduly

12

prolonged it.  Accordingly, the checkpoint detention of Ventura and his fellow passengers did not exceed its permissible duration.  Because the drug evidence against Ventura was not the fruit of an illegally extended seizure, the district court wrongly granted the motion to suppress.

REVERSED AND REMANDED