United States Court of Appeals
Fifth Circuit

**F I L E D**

**December 15, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 04-41700

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

VERONICA JAIME,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Texas

_____

Before KING, GARWOOD and JOLLY, Circuit Judges.

GARWOOD, Circuit Judge:

Defendant-appellee Veronica Jaime (Jaime) is charged in a two count indictment with having, on or about October 1, 2003, possessed less than fifty kilograms of marihuana with intent to distribute it and having conspired to do so, contrary to 21 U.S.C. § 841(a)(1), 841(b)(1)(D) and 846. The United States appeals the district court's pre-trial order granting Jaime's motion to suppress evidence obtained in a search of Jaime's suitcase while

she was a passenger on a bus stopped at a fixed immigration checkpoint.  We vacate and remand.

### Facts and Proceedings Below

On October 1, 2003, Jaime was a passenger on a Greyhound bus traveling north when it was stopped at the permanent immigration inspection station fifteen miles north of Laredo, Texas, on Interstate 35.  Border Patrol Agent Corey Grubbs boarded the bus at its front to perform an immigration inspection of all the passengers.  He was the only agent on the bus.  Agent Grubbs proceeded to move down the aisle of the bus, asking each passenger (other than those who were "handing me immigration documents") in turn to state his or her citizenship and travel plans.  Jaime was seated in an aisle seat slightly in front of the middle of the bus. The window seat next to her was unoccupied.  There were some passengers in front of her and some behind her.  When Agent Grubbs reached Jaime, he asked her to state her citizenship.  Jaime replied that she was a United States citizen.  Agent Grubbs then asked Jaime about her travel plans and she responded accordingly. The interview was conducted entirely in English.

Agent Grubbs then asked Jaime whether a suitcase on the floor in front of the window seat next to her belonged to her.[1]  He

---

[1] Jaime and Agent Grubbs, the only witnesses to testify at the suppression hearing, disagreed as to the sequence of these events.  At the hearing, Jaime contended that Agent Grubbs moved on to the next passenger after asking her the two initial, immigration-related questions. According to Jaime, it was only after

2

testified that he found the bag's presence odd, and "believed there might be narcotics in it," because, in his experience, most people placed baggage of that size in the checked luggage compartment of the bus.[2]  Jaime confirmed the bag was hers and Agent Grubbs then asked whether he could look inside it.[3]  Jaime consented, and opened the front pocket of the bag, revealing only clothing.  Agent Grubbs then asked Jaime to open the back pocket of the bag.  She did so and, upon Jaime opening the back pocket, Agent Grubbs immediately recognized what appeared to be a bundle of marihuana.[4]  Agent Grubbs removed Jaime and her bag from the bus, and then

---

Agent Grubbs completed questioning of all the passengers and checked the bathroom at the rear of the bus that he returned to her and asked for consent to search her bag.  However, the district court explicitly found Agent Grubbs's account to be more credible, stating in its suppression memorandum and order:

> "There was some dispute about the sequence of these events.  At the suppression hearing, Defendant contended that Agent Grubbs moved on to the next passenger after asking her the initial two questions.  According to her testimony, it was only after Agent Grubbs completed questioning all of the passengers and checked the bathroom that he returned and asked for consent to search her bag.  The Court did not find this account to be as credible as Agent Grubbs' testimony.  According to Agent Grubbs, he stopped at Defendant's seat, questioned her, and removed her from the bus, all before he had completed his immigration inspection of the remaining passengers."

[2]Agent Grubbs also testified that as he "was walking down the aisle" he "noticed" that Jaime "would look at me and then look the other way . . . every time my eyes would meet her she would look the other way," and this "caught" his "attention."

[3]Jaime claims that Agent Grubbs did not ask for her consent to search the bag, but instead simply asked her to open the bag.  Agent Grubbs contends he "asked Ms. Jaime if she minded if he looked inside the suitcase."  The district court did not expressly resolve this difference but did recite Agent Grubbs's version several times in its order.

[4]Agents subsequently found approximately 11 pounds of marihuana in the bag.

3

reboarded the bus to complete his immigration inspection of the remaining passengers.

Agent Grubbs testified that his questions to Jaime were "asked one right after the other" and that from the time he "asked her if she was a U.S. citizen" to the time when he "actually got consent to look in the bag", the total amount of time that "had elapsed" was "maybe ten seconds." Agent Grubbs also stated that by the time he escorted Jaime off the bus, no more than a minute had been spent with Jaime. Agent Grubbs admitted that he was satisfied that Jaime was a United States citizen within the first ten seconds, after the initial two questions, and that asking for consent to search the bag did not "have anything to do with immigration status" but "didn't extend what is customary" for him "to interview somebody for immigration purposes." He also testified that he was not acting in an intimidating or coercive manner when he asked for consent to search Jaime's bag and that "she was not in custody" then. He stated that Jaime seemed cooperative and did not hesitate to open her bag.[5]

The district court concluded that the evidence should be suppressed under the most recent circuit precedent, although the court noted its belief that the state of the law was "unsatisfactory" on this issue and that "Ms. Jaime is getting an

_____

[5]Agent Grubbs was in uniform. Jaime did not know whether he was armed and there is no evidence that he was.

4

absolutely undeserved windfall on this." The court then issued a written "memorandum and order" granting Jaime's motion to suppress. The court there ruled that with respect to Jaime the valid immigration fixed checkpoint suspicionless detention terminated as soon as Agent Grubbs was satisfied of her citizenship, which was immediately after she stated her travel plans, and accordingly any further detention was unconstitutional.[6] Referring to our decisions in *United States v. Portillo-Aguirre*, 311 F.3d 647 (5th Cir. 2002), *United States v. Chacon*, 330 F.3d 323 (5th Cir. 2003), and *United States v. Machuca-Barrera*, 261 F.3d 425 (5th Cir. 2001), the court concluded that "the *Portillo-Aguirre/Chacon* 'subjective motivation' test – and not the former *Machuca-Barrera* 'duration' test – is the standard for evaluating the propriety of a seizure at an immigration checkpoint," and that "absent reasonable suspicion, an agent may not continue to question an individual stopped at an immigration checkpoint after becoming satisfied as to that

---

[6]The court stated that it "does not find that Agent Grubbs had a reasonable suspicion that Defendant was engaged in wrongdoing" and accordingly determined that the detention could not be validly extended on such a basis. The government in its appeal does not challenge that ruling of the district court, and we accordingly accept it for present purposes. *See United States v. Bigler*, 817 F.2d 1139, 1140 (5th Cir. 1987).

The district court also rejected the government's contention made below that the validity of the detention was to be determined on a bus-wide, not on an individual passenger, basis. At oral argument the government agreed, as did appellee Jaime, that the individual passenger approach is appropriate, and accordingly we here proceed on that basis. *But see, e.g.*, *United States v. Garcia-Garcia*, 319 F.3d 726, 730 (5th Cir. 2003); *United States v. Ventura*, 447 F.3d 375, 381-82 (5th Cir. 2006). Nor does the government argue that the good faith exception to the exclusionary rule, *United States v. DeLeon-Reyna*, 930 F.3d 396, 400-01 (5th Cir. 1991) (en banc), is applicable. We accordingly likewise do not address that matter.

5

individual's immigration status."  The court held that "the immigration purpose of the stop was complete" at the "moment" Agent Grubbs was satisfied as to Jaime's immigration status, and, there being no reasonable suspicion, from that instant on Jaime was under "illegal detention."  The court held that the search was not validated by Jaime's consent because it was requested and given *after* – albeit virtually immediately after – Agent Grubbs became satisfied as to Jaime's immigration status, and "no circumstances intervened between the detention and the consent," and "[t]herefore, no matter how voluntarily Defendant gave her consent, the search was impermissible."

**Discussion**

### A.  *Standard of Review*

Reviewing a district court's ruling on a motion to suppress, this court accepts the district court's factual findings "unless clearly erroneous or influenced by an incorrect view of the law." *United States v. Alvarez*, 6 F.3d 287, 289 (5th Cir. 1993).  The district court's conclusions of law are reviewed *de novo*.  *Id.*  To the extent the underlying facts are undisputed we may resolve questions such as probable cause and reasonable suspicion as questions of law.  *United States v. Ibarra-Sanchez*, 199 F.3d 753, 758 (5th Cir. 1999).

### B.  *Detention*

6

At a fixed checkpoint having the primary purpose of identifying illegal immigrants, vehicles may be briefly detained in furtherance of that purpose and their occupants questioned, all without either a warrant or any individualized reasonable suspicion, but "checkpoint searches are constitutional only if justified by consent or probable cause to search" and "[a]ny further detention . . . must be based on consent or probable cause." *United States v. Martinez-Fuerte*, 96 S.Ct. 3074, 3087 (1976) (internal quotation marks and citations omitted).[7]

In *City of Indianapolis v. Edmond,* 121 S.Ct. 447 (2000), the Supreme Court held invalid a highway checkpoint program concededly having "the primary purpose of interdicting illegal narcotics," *id*. at 453, stating "we decline to approve a program whose primary purpose is ultimately indistinguishable from the general interest in crime control." *Id*. at 455.[8] At such checkpoints, "stops can

---

[7]Over ten years after *Martinez-Fuerte*, our en banc court in *United States v. Jackson*, 825 F.2d 853 (5th Cir. 1987), in reviewing that and related Supreme Court decisions, noted that the legal limitations imposed by those cases on detentions at fixed immigration checkpoints were not unduly restrictive *because* even as so limited those stops afforded agents the "opportunity to" (*inter alia*) "obtain consent to support a search." *Id*. at 862.

[8]*Edmond* asserts that the dissenting opinion there "erroneously characterizes" the majority as holding that the "'use of a drug-sniffing dog . . . annuls what is otherwise plainly constitutional;'" that characterization is said to be erroneous because "the constitutional defect of the program is that its primary purpose is to advance the general interest in crime control." *Id*. at 456 n.1.

We have held that a fixed checkpoint having as its *primary* purpose the identification of illegal immigrants is not rendered invalid under *Edmond* by having as a *secondary* purpose narcotics interdiction (as reflected by having permanently available there dogs cross-trained to detect drugs as well as humans). *United States v. Moreno-Vargas*, 315 F.3d 489 (5th Cir. 2002) (noting

only be justified by some quantum of individualized suspicion." *Id.* at 457. *Edmond* goes on to state that its holding "does not impair the ability" of officers to act on "information they properly learn during a checkpoint stop justified by a lawful primary purpose," even though that results in "arrest . . . for an offense unrelated to that purpose." *Id*. Immediately thereafter, *Edmond* explains "that the purpose inquiry in this context is to be conducted *only* at the programmatic level and is not an invitation to probe the minds of individual officers acting at the scene. *Cf.* *Whren [v. United States*, 116 S.Ct. 1769 (1996)*], supra."* (emphasis added).[9]

As noted, the district court ruled that Jaime's consent to the search of her bag was invalid, "no matter how voluntarily [she] gave her consent," because it was given while she was under illegal detention and "no circumstances intervened between the detention

---

there was no evidence the checkpoint would not be maintained without the secondary purpose). *See also, e.g., United States v. Davis*, 270 F.3d 977, 979 (D.C. Cir. 2001).

[9]As *Edmond* had earlier observed, *Whren* held that "an individual officer's subjective intentions are irrelevant to the Fourth Amendment validity of a traffic stop that is justified objectively" and that the same is true of "the actual motivations of the individual officers involved." *Edmond* at 456. As more recently reflected in *Brigham v. City of Stuart*, 126 S.Ct. 1943, 1948 (2006), *Whren* is but one of many Supreme Court holdings that "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify the action' . . . [t]he officer's subjective motivation is irrelevant,'" and *Edmond* "has nothing to do with discerning what is in the mind of the individual officer conducting the search." *See also Ohio v. Robinette*, 117 S.Ct. 417, 420 (1996) ("the subjective intentions of the officer did not make the continued detention of respondent illegal," citing *Whren*).

8

and consent." The central issue on this appeal is the correctness of the district court's legal conclusion that Jaime was then under illegal detention *because* virtually immediately before Agent Grubbs asked for, and Jaime gave, her consent, he had (as reflected only by his admission at the suppression hearing) subjectively satisfied himself (on the basis of her answers to his initial two questions) as to her citizenship. The district court reached this conclusion notwithstanding that Agent Grubbs's credited testimony reflects that no more than approximately ten seconds elapsed between his initial encounter with Jaime and his asking and receiving the consent to search, and that the total elapsed time from his initial question of Jaime to her giving of consent to search her bag was not greater than what was customary to interview somebody for immigration purposes.

In its resolution of this legal issue the district court, and the parties below and on this appeal, focused mainly on our decisions in *Machuca-Barrera*, *Chacon* and *Portillo-Aguirre*. The district court concluded that the latter two cases essentially supplanted *Machuca-Barrera* and controlled outcome here. We disagree, and accordingly vacate the district court's order and remand.

In *Machuca-Barrera*, we addressed the validity of a suspicionless consent based search at a fixed immigration checkpoint in light of *Martinez-Fuerte* and *Edmond*. The evidence

9

there showed that late on a Sunday afternoon the 19-year-old defendant Machuca-Barrera, accompanied by a 15-year-old-male companion, drove his car to the checkpoint, where Border Patrol Agent Holt:

> ". . . questioned the pair about their travel plans and citizenship. [They] replied that they were U.S. citizens living in Pecos, Texas, and that they were returning from a weekend trip to Ojinaga, Mexico.
>       *At this point*, Agent Holt asked them whether they were carrying any firearms or drugs.  Machuca-Barrera replied no.  Agent Holt requested consent to search the car, which Machuca-Barrera gave." *Id*., 261 F.3d at 429-30.  (emphasis added; footnote omitted).

The district court, although crediting the defendant's version of the events, overruled a motion to suppress the fruits of the search which found marihuana hidden in a speaker box. *Id*.  We affirmed.

We held that "because the brief stop . . . lasted no longer than necessary to fulfill its immigration-related purpose, the stop did not violate the Fourth Amendment."  *Id*. at 429.  For this purpose, we considered *only* the time "up to the point at which Machuca-Barrera consented to a search of his car"[10] because "[a]fter Machuca-Barrera consented to a search, Agent Holt needed no

_____

[10]We noted that throughout that period there was no reasonable suspicion respecting Machuca-Barrera (or his car or his companion).  *Id*. at 435 ns.31 and 32.

10

justification to prolong the encounter." *Id*. at 435.[11]  Our holding

in this respect rested on two legal principles.

*First*, that so long as the primary programmatic purpose of the

checkpoint was the detection of illegal immigrants, the permissible

duration of a suspicionless detention there would be determined by

objective factors, *not* by the subjective motivation or state of

mind of the specific individual officers conducting the stop and

related examination or questioning on the particular occasion at

issue.  Thus we stated that "[i]t is the length of the detention,

not the questions asked, that makes a specific stop unreasonable,"

*id*. at 432, and that:

> "We decline a protocol that measures the pertinence of
> questions to the immigration purpose by an after-the-fact
> standard for admissibility at trial. . . . policing the
> duration of the stop is the most practical enforcing
> discipline of purpose.  The key is the rule that a stop
> may not exceed its permissible duration . . . We deploy
> a test that is both workable and which reinforces our
> resistance to parsing the relevance of particular
> questions.  To scrutinize too closely a set of questions
> asked by a Border Patrol agent . . . would court inquiry
> into the subjective purpose of the officer asking the
> questions.[26]
> 26.  We do not inquire into the motives of individual
> Border Patrol agents in performing stops.  *See Whren v.
> United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135
> L.Ed.2d 89 (1996). . . ."  *Id*. at 432.

---

[11]In this connection we observed that "[b]ecause we find no Fourth Amendment violation, we need not address Machuca-Barrera's claim that his consent was invalidated by a constitutional violation." *Id*., n.33.

*See also id*. at 433 ("we will not scrutinize the particular questions a Border Patrol agent chooses to ask as long as in sum they generally relate to determining citizenship status").

The *second* principle thus relied on in *Machuca-Barrera* is that the permissible duration of a suspicionless stop at a fixed immigration checkpoint *includes* the time necessary to "request consent to extend the detention." *Id*. at 433. Thus, we held:

> "The scope of an immigration checkpoint stop is limited to the justifying, programmatic purpose of the stop: determining the citizenship status of persons passing through the checkpoint. *The permissible duration of an immigration checkpoint* stop is therefore the time *reasonably* necessary to determine the citizenship status of the persons stopped. This *would include the time necessary to* ascertain the number and identity of the occupants of the vehicle, inquire about citizenship status, request identification or other proof of citizenship, and *request consent to extend the detention*." *Id*. (emphasis added; footnotes omitted).

On the basis of the foregoing two principles, we held that Machuca-Barrera's suspicionless detention at the checkpoint was legal *because* its *duration*, up to the time he gave his consent to search, was objectively reasonable, and thereafter the duration of his detention could be lawfully extended without any other justification. We stated:

> ". . . the permissible duration of the stop was the amount of time reasonably necessary for Agent Holt to ask a few questions about immigration status. Agent Holt's few questions took no more than a couple of minutes; this is within the permissible duration of an immigration checkpoint stop. Although Machuca-Barrera notes that Agent Holt asked a question about drugs, we will not

12

second-guess Agent Holt's judgment in asking that question. The brief stop by Agent Holt, which determined the citizenship status of the travelers and lasted *no more than a couple of minutes before Agent Holt requested and received consent* to search, was constitutional." *Id*. at 435.

It is clear that *Machuca-Barrera* dictates the result here. There, the time elapsed between the agents' initial contact with the defendant until he consented to the request to search his vehicle was "no more than a couple of minutes;" here the comparable time was clearly less than half a minute. During that period of time three things occurred in *Machuca-Barrera*. First, citizenship and travel plan questions were asked and answered, the answers reflecting United States citizenship, and that is likewise the case here. Second, in *Machuca-Barrera*, the agents asked questions about carrying drugs and guns, which were answered in the negative, and we declined to "second-guess" the asking of that question or to engage in "inquiry into the subjective purpose of the officer asking the questions." The next thing that occurred in *Machuca-Barrera* was that consent to search the car was asked for and given, and we expressly and specifically held that the permissible duration of a suspicionless fixed checkpoint immigration stop *included* the time reasonably necessary to request consent to extend the detention (and, by necessary implication, to receive the reply to the request) by consenting to search of the vehicle. Here, what immediately followed the citizenship and travel plan questions and

answers, was Jaime being asked if the bag was hers, and on her promptly responding that it was, whether she would consent to its search and her affirmative reply. Clearly the question whether the bag was hers was a part of, and a necessary predicate to, asking her consent to search it, and hence should be treated in the same way as the request for and receipt of consent to search was in *Machuca-Barrera*. But, even wholly apart from that, there is no conceivable justification for holding that the bag ownership question and answer impermissibly extended the duration of the stop here, while the carrying drugs or weapons question and answer in *Machuca-Barrera* did not.

Jaime argues that *Machuca-Barrera* is distinguishable because there the consent to search was given before the agents had satisfied themselves that the car's occupants were citizens. We reject that argument. In the first place, no statement in *Machuca-Barrera*, nor anything in its factual recitation, supports that assertion. The opinion's factual recitation reflects that the *first* questions concerned citizenship and travel plans and the answers reflected that both individuals were U.S. citizens. The next questions related to drugs or guns being carried, and were answered negatively, followed only by asking for and receiving consent to search. Nothing else is related. Nothing suggests that the opinion does not completely state all the relevant facts up to

that point, and it specifically states that what follows that is irrelevant, as noted above.  In the second place, *Machuca-Barrera* clearly holds both that test is "the length of the detention" *and* that "the time necessary to . . . request consent to extend the detention" (by requesting and receiving consent to search) is included in the "permissible duration of the stop."  Therefore, under *Machuca-Barrera* it is necessarily irrelevant whether a non-immigration question comes before, rather than immediately following, the completion of the immigration questions and answers, for in either event the duration of the stop is equally extended, and, if the non-immigration question and answer are asking and giving consent to search, in either event the extension of the stop's duration is permissible.

*Machuca-Barrera* compels the conclusion that the duration of Jaime's detention from the first question Agent Grubbs asked her to the time she gave her consent to search her bag, a period of less than half a minute, was not excessive and that her detention during all that time was legally valid, no matter what Agent Grubbs subjectively concluded respecting her citizenship following her answers to his initial questions of her.

No subsequent decision of the Supreme Court or of this court en banc is inconsistent with *Machuca-Barrera* or the principles it announces, and consequently the later panel decisions in *Portillo-*

15

*Aguirre* and *Chacon* cannot require a different result here than that mandated by *Machuca-Barrera*. *See, e.g., Rios v. City of Del Rio, Texas*, 444 F.3d 417, 425 n.8 (5th Cir. 2006). We note, however, that in any event *Portillo-Aguirre* and *Chacon* involve a possibly significantly different factual scenario than that presented here.

In *Portillo-Aguirre*, we addressed a bus stopped at the Sierra Blanca fixed immigration checkpoint in September 2000. Agent Woodruff alone inspected the passengers' compartment starting at the front of the bus, following his standard *modus operandi* verifying each passenger's citizenship status as he made his way down the aisle to the back of the bus. The defendants, Mr. and Mrs. Portillo-Aguirre, were sitting respectively in the driver's side window seats in the fourth and third rows from the front of the bus. 311 F.3d at 650. The agent testified he was satisfied their "presence in the United States was lawful" and continued his inspection to the back of the bus where he also checked the bathroom for illegal aliens or narcotics. "After . . . [the agent] completed his immigration inspection, and while he was returning to the front of the bus to exit, he noticed a small carry-on bag underneath Portillo-Aguirre's seat" which he had not seen before, and this aroused his suspicion and he asked Portillo-Aguirre if he had a bag on the bus. Aguirre pointed to a backpack in the

16

overhead bin, the agent asked if the bag under the seat was his, and, on an affirmative response, next asked what it contained, to which the response was books and clothes. The agent *then* asked for and received consent to search the bag. *Id*. at 650-51. Subsequently, consent was also requested and received to search Mrs. Portillo-Aguirre's similarly designed but different colored carry-on bag. *Id*. The agent "testified that he had determined the citizenship status of the bus passengers *before* he began to question Portillo-Aguirre about the bag underneath his seat." *Id*. at 653. The opinion further states that on the occasion in question the agent followed his usual "*modus operandi* for bus inspections," which was to first "verify the passengers' citizenship status and then begin looking for signs of narcotics trafficking." The panel stated that this "general method" does not pass "constitutional muster" because it "is essentially an attempt to circumvent the Court's holding in *Edmond* by broadening the scope of an otherwise lawful immigration seizure to include drug interdiction activity." *Id*. at 655. The panel noted "immigration inspection of a passenger bus normally lasts three to five minutes" but that "[a]fter determining the passengers' citizenship status" the agent "extended the stop for an additional three to five minutes" to investigate whether Portillo-Aguirre was carrying drugs. *Id*. at 656. This led the panel to distinguish *Machuca-*

17

*Barrera* on the ground that "unlike in *Machuca-Barrera*, where the Border Patrol agent inquired about drugs during the course of the immigration inspection, Agent Woodruff had completed his inspection before he turned his attention to drug interdiction."  *Id*.

Such reasoning likewise distinguishes the present case from *Portillo-Aguirre* because here Agent Grubbs, when he asked Jaime whether the bag was hers and if she would consent to its search, had *not* completed his immigration inspection of the bus (and indeed had not even reached the back half of the bus).[12]  Further, it may arguably be that *Portillo-Aguirre* does not contravene the prohibition of probing "the minds of individual officers acting at the scene" which *Edmond* recognizes as distinct from the permissible determination of the *primary programmatic* purpose of the establishment and maintenance of the checkpoint.  *See* note 9 *supra* and accompanying text.[13]  This is perhaps so because the duration of the agent's inspection (unextended by any consent or reasonable suspicion) took approximately twice as long as the normal

---

[12]We also note that *Portillo-Aguirre*'s quoted statement suggesting that the drug questions in *Machuca-Barrera* were asked while the agents were still trying to satisfy themselves as to citizenship is wholly unsupported, as the only citizenship and travel plan questions had already been asked and answered. Moreover, in *Machuca-Barrera* the drug questions did not produce a different result because the court based its decision on the reasonable *length* of the detention objectively determined, *not* on the questions asked (or the agent's subjective motives in asking them).

[13]We note, however, that *Portillo-Aguirre* does not address or even cite this portion of *Edmond*, or the comparable passages of *Machuca-Barrera*.  That is also true of *Chacon* and of *United States v. Ellis*, 330 F.3d 677 (5th Cir. 2003), each discussed *infra*.

immigration-only inspection and also because the agent's general *modus operandi*, followed in that instance, was to go from the front of the bus to the back and in that process question each and every passenger on the bus as to his or her citizenship and authority to be in the United States, examining the bathroom at the rear, and then proceed from the back to the front to exit the bus *without* further questioning *any* passengers as to their citizenship or right to be in the United States.  In any event, such facts are plainly distinguishable from those here, where the time from the first question of Jaime to her giving consent to search was less than thirty seconds and did *not* exceed the normal, objectively reasonable time to question a passenger as to immigration status. We also note that nothing in *Portillo-Aguirre* is inconsistent with (or, indeed, even cites) *Machuca-Barrera*'s holding that the permissible duration of a suspicionless detention at a fixed immigration checkpoint *includes* the time reasonably necessary to request consent (and receive response thereto) to extend the detention (in that case and this by consenting to a search).[14]

*Chacon*, decided after *Portillo-Aguirre*, involved the same border patrol agent inspecting a bus at the same checkpoint about six weeks after the stop at issue in *Portillo-Aguirre*.  In *Chacon*, the defendant and his companion "were sitting together about half

---

[14]This is also true of *Chacon*, discussed *infra*.

way down the aisle." 330 F.3d at 325. The agent followed his routine of proceeding from the front of the bus to the rear examining all the passengers as to their citizenship and authority to be in the United States, and then examining the bathroom at the rear of the bus. The agent testified he was satisfied the defendant and his companion were United States citizens. However, as the agent started back to the front of the bus he recalled that the two had seemed "awkward" in their responses, and determined that he would ask them some more questions, arguably mentioning both immigration and drug related concerns. *Id*. When on his way back up the aisle the agent again reached the defendant and his companion he asked them where they were going and if they had any luggage, and subsequently requested and received consent to search one of their bags, which was found to contain marihuana. The district court in ruling on the motion to suppress failed to expressly make certain findings, and we remanded for that purpose, including findings on whether the agent had "completed his immigration inquiries of" the defendant and his companion "as he walked from the rear to the front of the bus" and "whether the bus's immigration detention was then unduly prolonged." *Id*. at 329. We had observed that "even if the inquiries" of the agent to the defendant and his companion on the agent's return to the front of the bus "related to illegal drugs, *Machuca-Barrera* holds them permissible so long as they were made during the reasonable length

20

of an immigration detention." *Id*. at 328. *Chacon* plainly proceeds on the premise that as the agent began his return to the front of the bus he had already completed his immigration examination of all passengers, with the possible single exception of the defendant and his companion. *Chacon*, like *Portillo-Aguirre*, not only cannot modify the holdings of *Machuca-Barrera*, but even apart from that does not in any event mandate affirmance here.[15]

---

[15]This is likewise true of *United States v. Ellis*, 330 F.3d 677 (5th Cir. 2003), also relied on to some extent by the district court and appellee. In *Ellis*, involving a 1998 stop of a bus at the Sierra Blanca checkpoint,

> "Agent Manuel Marquez boarded the bus and inquired as to every passenger's citizenship as he moved to the back of the bus. By the time he reached the back of the bus, Marquez had assured himself that all passengers on board were legally in the United States.
>
> Marquez then began to return to the front of the bus, searching the carry-on luggage in the upper bins using the 'squeeze and sniff' method that he had been taught as part of his Border Patrol training. Marquez would remove a piece of luggage from the overhead bin, squeeze it 'all the way around' to check for soft spots, and sometimes smell it. At some point in this process, Marquez felt a 'brick-like hard item' in a black travel bag, which he believed could be narcotics." *Id*. at 678.

After procuring a drug sniffing dog who alerted to the bag, other bags were "squeezed and sniffed," and eventually searched, disclosing narcotics. There the agent's *actions* – even apart from the fact that he had already asked *all* passengers about their immigration status – *objectively* considered by themselves (and without reliance on testimony as to the agent's subjective motivation) might well be deemed not immigration related. Indeed, as we recognized, such actions constituted a *search*, as the Supreme Court held in *Bond v. United States*, 120 S.Ct. 1462 (2000) (*Bond II*, reversing our contrary decision in *United States v. Bond*, 167 F.3d 225 (5th Cir. 1999) (*Bond I*)). No prior consent was given to *any* of the "squeezing and sniffing," nor (at least prior to the first time the process produced the feel of a brick like object), was there any reasonable suspicion. Under *Martinez-Fuerte* a search at a fixed immigration checkpoint is never justified – no matter *when* in the process it occurs – *unless* it is supported by "consent or probable cause." Whether the *search* in *Ellis* occurred before or after completion of the immigration inspection there, it was in *either* event illegal. Moreover, in *Bond* the Supreme Court made clear that the officer's "subjective intent" or "state of mind" in his squeezing and "physical manipulation of" the luggage in the overhead bin was "irrelevant in determining whether the officer's actions violated the Fourth Amendment." *Id*., 120 S.Ct. at 1465 n.2.

21

Under *Machuca-Barrera*, it is clear that the district court erred in holding that when Agent Grubbs received Jaime's consent to the search of her bag the permissible duration of her suspicionless detention at the fixed immigration checkpoint had been exceeded and her constitutional rights had been violated. Accordingly, the district court's determination that "no matter how voluntarily the Defendant [Jaime] gave her consent, the search was impermissible" *because* the consent was given while she was being *illegally* detained and no circumstances intervened between the illegal detention and the giving of the consent, is based on an error of law. We therefore vacate the district court's suppression order.

## CONCLUSION

The district court's suppression order is VACATED and the cause is REMANDED to the district court for further proceedings not inconsistent herewith.

VACATED and REMANDED.