Revised April 16, 2004

United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 31, 2004**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

No. 03-30576

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

CURTIS L. WILLIAMS,

Defendant-Appellant.

---

Appeal from the United States District Court
For the Western District of Louisiana

---

Before EMILIO M. GARZA, DeMOSS, and CLEMENT, Circuit Judges.

PER CURIAM:

Upon being indicted for possession of a firearm by a person under indictment for a felony, in contravention of 18 U.S.C. § 922(n), Appellant Curtis L. Williams entered a conditional plea of guilty, reserving his right to appeal the magistrate judge's denial of his motion to suppress the firearm and statements made at the time of his arrest. The district court subsequently adopted the magistrate's findings and recommendations and ordered that Williams's motion to suppress be denied. Williams timely appeals.

**BACKGROUND AND PROCEDURAL HISTORY**

Curtis Williams was indicted by a grand jury in Williamson County, Texas, in July 2000 for aggravated assault causing serious bodily injury.  The offense made the subject of the indictment is punishable by more than one year in jail under state law, thus satisfying the definition of a felony for purposes of 18 U.S.C. § 922(n). See Tex. Pen. Code Ann. § 22.02 (Vernon 1994) (defining "aggravated assault" as a felony); Id. §§ 12.32-.34 (establishing that any class of felony is punishable by a term of imprisonment of not less than two years).

While under indictment, Williams traveled to Louisiana from Texas on a Greyhound bus.  The bus on which Williams was traveling made a scheduled stop at the Shreveport Greyhound Bus terminal in the early morning hours of September 12, 2001.  Caddo Parrish Sheriff's deputies Carl Townley and Chris Bain were working with their drug detection dogs at the terminal.  The deputies were not in uniform nor did they display their weapons.  Deputy Bain and his dog stood next to the bus as the passengers disembarked.  Deputy Bain then entered the bus, allowing his dog to sniff for the presence of drugs.  Meanwhile, Deputy Townley was checking the luggage compartment beneath the passenger cabin with his dog, Raja. Deputy Townley had noted Williams's avoidance of the dog as Williams departed from the bus as well as Williams's interest in and curiosity about the dog's investigation of the luggage within

2

the bus. After observing Williams's mannerisms, Deputy Townley commented to a sergeant on the scene that it might be useful to "talk to Mr. Williams." After Deputy Bain completed his check of the bus's passenger cabin, Deputy Townley and Raja entered the bus. Raja alerted to a black backpack which was either in a seat or in the overhead bin of the bus.

Upon exiting the bus, Deputy Townley observed Williams still standing near the bus watching the activity occurring in the passenger cabin. Deputy Burrows, another deputy present at the terminal, approached Williams and asked him if he would mind talking with him. Williams followed Deputy Burrows, Deputy Townley, and Deputy Bain to the back of the bus station into the baggage handling area. The deputies then identified themselves as police officers and again asked Williams if he would talk with them. Williams stated that he had no problem doing so. When asked by the deputies about the nature of his travel plans, Williams responded by stating that he was on leave from the military traveling from Fort Hood, Texas, to Alabama. When asked for his military identification, Williams claimed he had lost it. Deputy Townley testified at the suppression hearing that this aroused his suspicions because this was the day after the terrorist attacks of September 11, 2001, and therefore he felt it was highly unlikely that any soldiers were allowed on leave. Additionally, Deputy Townley testified that in his experience soldiers always carry their military identification.

Deputy Townley then asked Williams if he had any illegal narcotics or contraband on his person or in his luggage. Williams admitted to the deputies that he had smoked marijuana before boarding the bus in Texas, but stated that he had none in his carry-on bag which was located on the bus. Williams agreed to retrieve his bag from the bus and was accompanied by Deputy Burrows. Upon their return, Deputy Townley noted that Williams's backpack was the same black backpack to which Raja had alerted earlier.

Williams then admitted to the deputies that he had lied about being in the military. At this point, for safety reasons, the deputies did not allow Williams to have the backpack. Williams allegedly became defensive and insisted that there was no marijuana in the backpack. Deputy Townley testified that he surmised, based on Williams's reaction, that perhaps there was something illegal in the backpack other than drugs. The deputies then asked Williams for consent to search the backpack, informing him that the dog had alerted to it. The deputies told Williams that they had probable cause to open the bag because of the dog's alert. Williams finally said, "Go ahead, look in the bag."

The deputies searched the bag and discovered a Glock 9 millimeter firearm with the sight removed.[1] Williams was

---

[1] Deputy Townley testified that the sight is often removed to allow fast withdrawal of the gun when it is hidden in a pants waistband.

4

subsequently arrested for illegally carrying a concealed weapon in violation of Louisiana state law. An ATF agent was summoned and soon discovered that Williams was under indictment in Texas for a felony offense. Thereafter, the government indicted Williams for possession of a firearm in violation of 18 U.S.C. § 922(n).

Upon being indicted for violating section 922(n), Williams filed a motion to suppress the firearm and statements made at the time of his arrest. The magistrate judge conducted a hearing on the motion. Before the magistrate issued his report and recommendations, Williams entered a conditional plea of guilty, reserving his right to appeal the magistrate judge's ruling on the motion to suppress. The guilty plea was entered on December 27, 2001, but Williams's counsel did not advise him that it was a conditional plea reserving the right to appeal an adverse ruling on the suppression motion. Because of the plea, no ruling was issued by the magistrate judge, yet an appeal was taken. The case was remanded by this court for a ruling on the motion. The magistrate judge subsequently denied the suppression motion. The district judge concurred with the magistrate judge's findings by order filed on May 16, 2003. Williams filed a timely notice of appeal.

## STANDARD OF REVIEW

This court reviews a denial of a motion to suppress under the two-tiered standard of review established in Ornelas v. United States, 517 U.S. 690, 694-97 (1996). We review the district

5

court's findings of fact supporting the denial of a motion to suppress under a clearly erroneous standard and review the district court's conclusions of law de novo. United States v. Singh, 261 F.3d 530, 535 (5th Cir. 2001). The legal interpretation of a sentencing guideline is reviewed de novo. United States v. Singleton, 946 F.2d 23, 24 (5th Cir. 1991).

## DISCUSSION

### I. Whether Williams's Fourth Amendment right to be free from an unreasonable search and seizure was violated.

Williams contends that although he may have initially cooperated with the officers, by the time he was escorted to and from the baggage handling area, separated from the other passengers, and repeatedly asked for consent to search his backpack, the questioning had become a non-consensual detention. In addition, Williams argues that he did not consent to the search of the backpack. Accordingly, he maintains, the firearm found during the warrantless search should have been suppressed.

The government agrees that the initial encounter between Williams and the police officers was consensual. The government argues that the encounter remained consensual until Williams was confronted with the fact that a dog had alerted to his backpack and the officers asked if he was carrying anything illegal. It was at this time that the government contends a Terry stop, as established in Terry v. Ohio, 392 U.S. 1 (1968), was initiated. The government argues that the Terry stop was for a limited period of time — a few

6

minutes — and ended in Williams's consent to search his backpack, which ultimately resulted in the discovery of the illegally possessed firearm. The government insists that the officers did not engage in any misconduct; however, even if the officers had or if Williams's consent was involuntary, the firearm would inevitably have been discovered because the dog had alerted to the backpack, thus providing the officers with probable cause to obtain a search warrant.

There are three recognized types of encounters between law enforcement officers and citizens, including: 1) a consensual encounter during which an individual voluntarily agrees to communicate with the police; 2) a limited investigatory stop based upon less than probable cause; and 3) an arrest which constitutes a seizure under the Fourth Amendment. United States v. Cooper, 43 F.3d 140, 145-46 (5th Cir. 1995). We shall take each of these categories and apply them to the facts of this case to determine whether Williams was deprived of his Fourth Amendment right to be free from an unreasonable search and seizure.

## A. Consensual Encounter

Under the consensual encounter arm of Fourth Amendment jurisprudence, the police can initiate contact with a person without having an objective level of suspicion, during which time the police may ask questions of the person, ask for identification, and request permission to search baggage that the individual may

have in his possession. United States v. Drayton, 536 U.S. 194, 200-01 (2002). The Supreme Court has recognized that the Fourth Amendment "permits police officers to approach bus passengers at random to ask questions and to request their consent to searches, provided a reasonable person would understand that he or she is free to refuse." Id. at 197. In deciding if an encounter between the police and a private citizen is consensual, the district court must determine if a reasonable person in the circumstances described would feel free to disregard the officers and proceed with his or her own business. Florida v. Bostick, 501 U.S. 429, 434 (1991).

In this case, Williams's initial agreement to talk with Deputy Burrows was a permitted consensual encounter that does not implicate the Fourth Amendment. Williams argues that the consensual nature of his encounter with the officers ended when he was requested by the officers to speak with them in the baggage handling area of the bus station. In making this argument, Williams tries to distinguish the facts of this case from those in Drayton. In Drayton, officers were engaged in a routine drug and weapons interdiction on board a Greyhound bus during a scheduled stop. 536 U.S. at 197-99. The Supreme Court concluded that bus passengers were not seized when officers boarded the bus and began questioning passengers. Id. at 200. The Court based its conclusion on an analysis of the "totality of the circumstances," noting particularly that there "was nothing coercive [or] confrontational

8

about the encounter." Id. at 204 (internal quotations omitted) (alteration in original). The Court further observed that there was "no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice." Id.

Williams's attempt to distinguish Drayton from the present case is unpersuasive. The government argues convincingly that the purpose of moving the location for questioning Williams into the baggage handling area was to get away from the loud noise made by the buses at the terminal. Based on testimony elicited at the suppression hearing, it was revealed that the extreme noise near the buses made it difficult to converse and would have made it necessary to yell, thus introducing an undesirable intensity to any conversation. Moreover, the layout of the bus station, particularly the location of the baggage handling area where the questioning was conducted, reveals that Williams was not subjected to a restrictive environment. Specifically, the baggage handling area opens directly out to both the open-air area of the terminal where the buses are parked and into the terminal waiting area. In addition, there were several baggage handlers in the room with Williams and the officers at the time of questioning. As such, Williams's voluntary entry into the baggage handling area for purposes of answering questions does not amount to a seizure, nor does it convert the consensual encounter into a Terry stop.

9

Once inside the baggage handling area, the officers identified themselves, asked Williams for identification, and inquired as to his travel plans. The officers did not request to search Williams's luggage, but asked if he was carrying any drugs on his person or in his luggage. There is nothing coercive about such questions. Based on testimony at the suppression hearing, the officers did not demand answers to their questions, leaving Williams free to decide whether to answer. The officers were not in uniform, displayed no weapons, and by all accounts maintained a professional decorum.

Once Williams answered the officers' questions, his responses apparently aroused suspicion in the officers. As noted previously, Williams claimed that he was a soldier on leave the day after the September 11, 2001, terrorist attacks, but said he had lost his military identification. When asked if he would mind retrieving his luggage from the bus, Williams agreed and accompanied one of the deputies onto the bus to retrieve it. Upon returning from the bus with his backpack, Williams acknowledged using marijuana immediately prior to boarding the bus and admitted that he had lied about being in the military. Adding to the heightened suspicions was the fact that Williams's backpack was the same backpack to which the dog had alerted earlier.

10

## B.  **Terry** Stop

Once the officers were presented with the circumstances as described above, the government argues that the officers had a proper basis to formulate reasonable suspicion, and the nature of their inquiry began to take on the character of a Terry stop. In evaluating the reasonableness of an investigatory Terry stop, this court must consider: 1) whether the officer's action was justified at its inception; and 2) whether it was reasonably related in scope to the circumstances that justified the interference in the first place. Terry, 392 U.S. at 19-20 (quotations omitted). If authorities have reasonable articulable suspicion that luggage contains contraband or evidence of a crime, a limited intrusion or seizure to pursue further investigation furthers a substantial governmental interest. United States v. Place, 462 U.S. 696, 703 (1983). The Supreme Court has observed that the permitted detention of luggage in such circumstances must be "properly limited in scope." Id. at 706. Submission of luggage to a canine sniff for narcotics does not constitute a Fourth Amendment search. Id. at 707 ("We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure."). Further, a dog's alert to the presence of narcotics is sufficient to provide probable cause to search. United States v. Williams, 69 F.3d 27, 28 (5th Cir. 1995).

11

After learning of Williams's untruthfulness regarding his military status and recognizing that the backpack alerted to by the dog was Williams's, the officers continued their detention. Specifically, they asked Williams why he had lied about being in the military and inquired whether he had anything illegal in his backpack. Williams vehemently denied having marijuana in his backpack. As stated previously, Deputy Townley testified that Williams's insistence that there was no marijuana in his backpack led Townley to believe that there was something else illegal in the bag. Thereafter, the officers truthfully informed Williams that the dog had alerted to his backpack, and therefore the officers had probable cause to search his backpack, with or without his consent.[2] Williams then told the officers they could "go ahead and open it." The officers neither made a show of force nor did they threaten or intimidate Williams.

The dog's alert provided the officers with probable cause to believe that the backpack contained narcotics, and they could have retained custody of it until a search warrant was obtained. The arrest on state gun charges occurred immediately after the firearm was discovered in Williams's backpack. The entire encounter

---

[2] We note that at no time did the deputies reveal to Williams that they would need to obtain a search warrant to search his backpack if he refused to give his consent. While this omission on the part of the deputies is not determinative of the voluntariness of Williams's subsequent consent, had the deputies so informed him, it certainly would have provided stronger support for the government's position that Williams's consent was in fact voluntary.

occurred between the arrival of the bus and its subsequent departure. At the time of Williams's arrest, the bus on which he had been a passenger had not yet left the terminal. Based on testimony elicited at the suppression hearing, the buses usually remain at the terminal for approximately twenty minutes and Williams's detention was perhaps no more than five or ten minutes for the Terry stop.

## C. Exception to the Exclusionary Rule

The government contends that even if this court were to conclude that the encounter at issue was unreasonable or exceeded the constitutional parameters of either a consensual encounter or a Terry stop, Williams's consent to the search would rectify any Fourth Amendment violation. The government argues that Williams had been cooperative with the officers up to the point where they asked for consent to search his bag, and the officers conducted the search in the good faith belief that Williams had consented in the same spirit of cooperation which he had maintained to that point in the encounter. To support this contention, the government cites Williams's initial refusal to consent as an indication that he felt free to object to the officers and to refuse consent.

Conversely, Williams argues that his alleged statement "go ahead then" was not one of consent, but rather an acknowledgment of Deputy Townley's statement that the officers could do what they wanted without regard to Williams's wishes. Williams cites Florida

13

v. Bostick, 501 U.S. 429, 434 (1991), for his assertion that he was coerced into allowing the officers to search his backpack and was not at liberty to ignore the police presence and go about his business.

The critical flaw with Williams's reliance on Bostick lies in the fact that Bostick governs circumstances involving consensual encounters between law enforcement and citizens. 501 U.S. at 434. At the point in which the officers asked Williams for his consent to search his backpack, it is clear that the officers had probable cause to conduct such a search, implicating an altogether different standard under the Fourth Amendment. Williams's consent, although given after he was made aware that the officers had probable cause to seek a search warrant, was nevertheless voluntary.

In addition, this court has established a six-factor inquiry for determining whether consent was voluntarily given, such factors including: "1) the voluntariness of the defendant's custodial status; 2) the presence of coercive police procedures; 3) the extent and level of the defendant's cooperation with the police; 4) the defendant's awareness of his right to refuse consent; 5) the defendant's education and intelligence; and 6) the defendant's belief that no incriminating evidence will be found." United States v. Hernandez, 279 F.3d 302, 307 (5th Cir. 2002) (citing United States v. Jones, 234 F.3d 234, 242 (5th Cir. 2000)). No single factor in this analysis is dispositive. Id.

Taking these factors in turn, we first observe that Williams's

14

custodial status was voluntary. Williams was not in custody when he initially agreed to speak with the officers inside the baggage handling area or when he gave the officers consent to search his backpack. Second, as previously discussed, there is no evidence that the officers' conduct was coercive. Testimony at the suppression hearing revealed that the officers, who were not in uniform nor displayed their weapons, did not demand answers to any of their questions, leaving Williams free to decide whether to answer. Third, the degree of Williams's cooperation with the officers was substantial. In addition to agreeing to accompany the officers to the baggage handling area, Williams subsequently agreed to escort an officer back onto the bus to retrieve Williams's backpack. As further evidence of his cooperative behavior, Williams also answered all questions posed by the officers. Nowhere in the record is it reflected that Williams was uncooperative with the officers at any time.

Fourth, there is evidence demonstrating that Williams was made aware of his right to refuse consent. Upon learning that the backpack to which the dog had alerted belonged to Williams, the officers informed him that he did not have to provide consent because the officers had probable cause to obtain a search warrant for the backpack. Fifth, the presentence investigation report revealed that Williams received his GED; however, there is nothing in the record that indicates Williams's lack of education or intelligence made his consent involuntary. Finally, it would

15

appear that Williams believed that officers would find incriminating evidence inside his backpack, <u>i.e.</u>, the Glock 9 millimeter firearm. However, this factor alone is not determinative in our analysis. <u>Hernandez</u>, 279 F.3d at 307. Accordingly, based on an application of the facts in the instant case to the six-factor inquiry discussed above, we conclude that Williams's consent to search his backpack was voluntarily given.

**II. Whether United States Sentencing Guideline § 2K2.1(b)(4) violates due process because it provides a sentencing enhancement for a firearm violation if the firearm is stolen, regardless of the defendant's knowledge of its stolen character.**

Williams argues that the two-level sentence enhancement he received under United States Sentencing Guideline § 2K2.1(b)(4) should require some level of knowledge regarding the stolen character of the firearm. Specifically, Williams contends that without a knowledge requirement, a person may be subject to additional prison time based solely on a reason or factor the person had no knowledge or reason to know existed, and thus constitutes a due process violation.

Section 2K2.1 establishes base offense levels for a wide variety of federal firearm offenses, and also provides for enhancements to those base levels under certain circumstances. One such enhancement requires an increase of the base offense by two levels if the firearm was stolen. U.S. Sᴇɴᴛᴇɴᴄɪɴɢ Gᴜɪᴅᴇʟɪɴᴇs Mᴀɴᴜᴀʟ § 2K2.1(b)(4) (2000). The application notes to this guideline

16

specifically state that "[t]he enhancement under subsection (b)(4) for a stolen firearm . . . applies whether or not the defendant knew or had reason to believe that the firearm was stolen." Id. § 2K2.1, cmt. n.19.

Moreover, in United States v. Singleton, 946 F.2d 23, 26-27 (5th Cir. 1991), the Fifth Circuit confirmed that this sentencing enhancement may be applied without a showing that the defendant had knowledge that the firearm was stolen. The Singleton court determined that "the upward adjustment for possession of a stolen firearm does not stand alone as an independent crime but is part of a sentencing court's quest to formulate a proper sentence." Id. at 26. Additionally, the court concluded that because the upward adjustment occurs during sentencing, when the district court's discretionary authority is especially broad, this adjustment does not offend due process. Id. at 27. Consequently, Williams's constitutional challenge to his sentencing enhancement pursuant to § 2K2.1(b)(4) fails.

## CONCLUSION

Having carefully reviewed the record of this case and the parties' respective briefing and arguments, and for the reasons set forth above, we AFFIRM the district court's denial of Williams's motion to suppress the firearm found in his possession; and we conclude that Williams's enhanced sentence for possessing a stolen firearm in contravention of United States Sentencing Guideline

17

§ 2K2.1(b)(4) is not unconstitutional, and thus should likewise be
AFFIRMED.