# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-20808

United States Court of Appeals
Fifth Circuit

**FILED**

December 6, 2017

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellant,

v.

MORRIS ALEXANDER WISE,

Defendant–Appellee.

Appeal from the United States District Court
for the Southern District of Texas

Before CLEMENT, PRADO, and HAYNES, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

We REVERSE the district court's decision to grant Defendant–Appellee Morris Wise's motion to suppress.

Wise was traveling on a Greyhound bus when police officers performed a bus interdiction at a Conroe, Texas bus stop. Officers boarded the Greyhound, and Wise aroused an officer's suspicion. The officer questioned Wise about his luggage. Two pieces of luggage were stored in the luggage rack above Wise's head. Wise claimed only one piece of luggage as his own; no one claimed the second piece. The officers removed the unclaimed article from the bus, and they determined that the luggage contained cocaine. The officers asked Wise to leave the bus. He complied. Off the bus, officers asked Wise to empty his pockets. He complied. Wise gave the officers an identification card with the

No. 16-20808

name "Morris Wise" on it. He also gave the officers a lanyard with keys; one key connected Wise to the backpack. The officers then arrested Wise.

Wise moved to suppress the evidence that officers found in his pockets. Following a suppression hearing, the district court suppressed *all* evidence obtained during the bus search. The district court found that the officers had established an unconstitutional checkpoint stop. The court also concluded that the bus driver did not voluntarily consent to the bus search.

## I. BACKGROUND

### A.    Factual Background[1]

On September 15, 2011, Conroe Police Department officers stationed themselves at a Greyhound bus stop located in Conroe, Texas, in order to perform bus interdictions. Bus interdictions typically involve law enforcement officers boarding a bus to speak with suspicious-looking passengers. The officers aim to discover individuals transporting narcotics, weapons, or other contraband. If the officers suspect criminal activity, they ask a passenger for his identification and boarding pass; they may also ask whether the passenger has any luggage with him. During the interdiction, passengers may leave the bus. They may also refuse to speak with officers.

That day, five Conroe Police Department officers were present at the Greyhound bus stop. Four officers were dressed in plainclothes—civilian clothes that do not include any markings of being a police officer—and concealed their weapons and badges. The remaining officer, a uniformed canine handler, was accompanied by a trained narcotics-detection canine.

---

[1] The district court did not make extensive findings of fact in either its suppression order or opinion on suppression. The facts come primarily from the suppression hearing testimony of two Conroe Police Department officers who questioned and subsequently arrested Wise.

No. 16-20808

That same day, Morris Wise traveled on Greyhound Bus #6408, which departed Houston, Texas, bound for Chicago, Illinois. At around 8:00 a.m., the bus made a scheduled stop at the Conroe station.

After the bus stopped, the driver disembarked. Conroe officers approached the driver and asked for his consent to search the bus's passenger cabin. The driver gave his consent. Detectives Randy Sanders and Juan Sauceda, veterans of the Conroe Police Department with narcotics interdiction experience, boarded the bus. The two were dressed in plainclothes. The remaining three officers waited near the bus. Detective Sauceda walked toward the back of the bus, while Detective Sanders remained at the front. The officers did not block the aisle.

Detective Sanders noticed Wise pretending to sleep, which he found suspicious. In his experience, criminals on buses often pretend to sleep to avoid police contact. Detective Sanders walked past Wise and turned around. Detective Sanders looked back at Wise, only to see that Wise had turned to look at him. Detective Sanders walked back toward Wise. The detective noticed that Wise's eyes were closed—but his eyelids were tightly clenched, and his eyes darted back and forth beneath his eyelids.

Detective Sanders, standing directly behind the seat, asked to see Wise's ticket. Wise handed Detective Sanders his ticket. The name on the ticket was "James Smith." That aroused Detective Sanders's suspicion; he thought this "very generic name" may be fake. Detective Sanders returned the ticket to Wise. He then asked whether Wise had any luggage. Wise said yes and motioned to the luggage rack above his head. Wise "appear[ed] nervous."

Two bags sat in the luggage rack above Wise's head: a duffle bag and a backpack that were "nestled together." No other bags were nearby. Detective Sanders asked Wise if he could search his bag. Wise stood, grabbed the duffle

3

bag, and placed the bag on his seat. Detective Sanders then asked Wise if he could look inside the bag. Wise agreed. The detective found nothing of interest.

Detective Sanders then asked Wise whether the backpack belonged to him. Wise said no. Detective Sanders said, "Dude, it was right next to your duffle bag. It's right above your head. Are you sure that's not your backpack?" Again, Wise said no. Detective Sanders thought Wise appeared nervous: "It's hard to explain, but he's not comfortable. . . . [H]e's looking at me kind of like the deer in the headlight look, like 'Oh, crap.'"

Detective Sanders then asked in a loud voice whether the backpack belonged to anyone on the bus. No one claimed the backpack. Detective Sauceda, who had joined Detective Sanders, then asked loudly whether the backpack belonged to anyone. No one claimed the backpack. Detective Sauceda grabbed the backpack and again asked loudly whether it belonged to anyone. No one claimed the backpack. He repeated the question one final time, showing passengers the backpack while asking. Again, no one claimed the backpack.

Detective Sauceda grabbed the backpack and exited the bus. The detective asked the bus driver whether he noticed who brought the backpack onboard. The driver had not noticed. Detective Sauceda then told the bus driver that no one had claimed the backpack, and he asked what to do. The driver said he did not want any unclaimed luggage on his bus. The detectives considered the backpack abandoned, so they complied with the bus driver's request and removed the backpack. Meanwhile, Wise remained seated on the bus—even though no one had restrained him or told him to stay on the bus.

Off the bus, the detectives placed the backpack on the ground next to bags that had been removed from the bus's luggage compartment. The canine handler then directed his dog to sniff the backpack and surrounding luggage. The canine alerted to the presence of drugs in the backpack. The backpack was locked with a small "TSA lock," so the officers cut the lock to open the backpack.

The officers discovered "seven small brick-type packages that were . . . all wrapped in a white cellophane." The detectives thought the packages contained narcotics. They cut the smallest package open, and it contained white powder that they believed to be cocaine.

After discovering the packages in the backpack, Detective Sanders re-entered the bus. Standing near the driver's seat, Detective Sanders motioned and asked Wise—in a tone that "was a little bit elevated"—to come speak with him off the bus. Wise "sa[id] something to the effect of, 'Who? Me?'" Detective Sanders said, "Yes, sir. Do you mind getting off the bus?" Wise complied and exited the bus. Detective Sanders did not tell Wise that he could refuse to speak to him or refuse to exit the bus.

Once off the bus, Detective Sanders identified himself to Wise. The detective said that he worked in the Conroe Police Department's narcotics division.[2] He told Wise that the backpack above his head contained a substance believed to be cocaine. In a conversational tone Detective Sanders asked Wise whether he had any weapons. Wise said no. Detective Sanders then asked Wise to empty his pockets. Wise complied. Among other items, Wise removed an identification card that Detective Sanders asked to see. Wise gave him the card. The card said "Morris Wise." Wise also removed a lanyard with several keys attached. Wise then put everything back in his pockets. The officers asked Wise if he could again remove the items from his pockets. The officers then asked to see Wise's keys. Wise held out his hand, and Detective Sauceda took the keys.[3] Detective Sauceda used a key to activate the locking mechanism on

---

[2] While outside, Wise was never told by an officer that he could remain silent or refuse to comply with their requests to empty his pockets.

[3] Some testimony supports Wise's contention that an officer removed the lanyard from Wise's pocket. However, this testimony is vague and is contradicted elsewhere in the record.

the "TSA lock" that the officers had cut from the backpack. Detective Sanders then arrested Wise.

## B.     Procedural Background

Wise was charged with two counts: (1) conspiracy to possess with intent to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii), and § 846; and (2) possession with intent to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii).

On March 4, 2013, Wise filed a motion to suppress the evidence the officers obtained after he was asked to exit the bus; he claimed this was an unconstitutional seizure. The Government timely filed its response and asserted that the officers had reasonable suspicion to perform an investigatory detention.

The district court held a suppression hearing on April 5, 2013. Detective Sanders and Detective Sauceda testified; Wise did not testify. During the hearing, both parties reiterated the arguments mentioned above. The district court then held a pretrial hearing on October 28, 2013. During the pretrial hearing, the district court judge stated that he would suppress "the bus search evidence."

On September 23, 2016—nearly three years later—the district court issued a written suppression order and opinion on suppression. The Government timely filed a motion for reconsideration, and Wise filed a response. The district court summarily denied the motion for reconsideration. The Government timely appealed.

No. 16-20808

## II. JURISDICTION

The Government appeals the district court's ruling on a motion to suppress evidence in a case involving the prosecution of a federal offense. The district court properly asserted jurisdiction under 18 U.S.C. § 3231.

The district court granted Wise's motion to suppress on September 23, 2016. The court denied the Government's motion to reconsider the suppression order on November 15, 2016. The Government timely filed a notice of appeal and certification by the United States Attorney pursuant to 18 U.S.C. § 3731. *See United States v. Arce–Jasso*, 389 F.3d 124, 127–28 (5th Cir. 2004) (finding that the 30-day time period for appealing a suppression ruling began when the court denied the motion for reconsideration). We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3731.

## III. STANDARD OF REVIEW

### A.     Motion to Suppress

"When examining a district court's ruling on a motion to suppress, we review questions of law de novo and factual findings for clear error." *United States v. Hearn*, 563 F.3d 95, 101 (5th Cir. 2009). "Factual findings are clearly erroneous only if a review of the record leaves this Court with a 'definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *United States v. Hernandez*, 279 F.3d 302, 306 (5th Cir. 2002)). Factual findings that are "influenced by an incorrect view of the law or an incorrect application of the correct legal test" are reviewed de novo. *United States v. Toussaint*, 838 F.3d 503, 507 (5th Cir. 2016); *accord United States v. Rodriguez*, 601 F.3d 402, 405 (5th Cir. 2010) ("The standard of review for a motion to suppress based on live testimony at a suppression hearing is to accept the trial court's factual findings unless clearly erroneous or influenced by an incorrect view of the law.") (citation and internal quotations omitted). We view the evidence "in the light most favorable to the prevailing party"—here, Wise. *See Toussaint*, 838 F.3d

at 507. We may affirm the district court's ruling on a motion to suppress "based on any rationale supported by the record." *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005).

## B.    Seizure

We review for clear error the district court's finding of whether a seizure occurred. *United States v. Mask*, 330 F.3d 330, 334 (5th Cir. 2003). However, "a district court's seizure determination is not entitled to deference if it is influenced by an incorrect view of the law." *Id.* at 335. In that case, the district court's conclusion is reviewed de novo. *Id.*

## C.    Fourth Amendment Standing

"We review *de novo* the legal question of whether a defendant has standing to challenge an allegedly illegal search as violative of the Fourth Amendment." *United States v. Riazco*, 91 F.3d 752, 754 (5th Cir. 1996).

## IV. DISCUSSION

## A.    The Conroe Police Did Not Establish an Unconstitutional Checkpoint

The district court concluded that the Conroe Police Department's decision to stop Greyhound Bus #6408 constituted an unconstitutional checkpoint stop. Accordingly, the court suppressed all evidence the police obtained subsequent to the stop.[4] The opinion on suppression focused on this issue. The court characterized a checkpoint stop as: "a police program in which officers gather at a specific place and, following a department-issued script, briefly speak to drivers without having any reason to suspect wrongdoing."

---

[4] Neither Wise nor the Government briefed this issue in advance of the suppression hearing. The parties also did not raise this issue during the suppression hearing. The district court raised this issue for the first time in its opinion on suppression. The Government rebutted this characterization in its motion for reconsideration. But the district court summarily dismissed that motion. Both parties have briefed the checkpoint argument on appeal.

*United States v. Wise*, 208 F. Supp. 3d 805, 808 (S.D. Tex. 2016) (citing *City of Indianapolis v. Edmond*, 531 U.S. 32, 35 (2000); *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 447 (1990)). The court asserted that the essence of an unconstitutional checkpoint stop is the forced interaction between an officer and a motorist. Moreover, the court found that checkpoint stops are only permissible "if they are for a narrow particular law enforcement purpose directly connected to the use of the roads." *Id.* at 809. According to the court, permissible law enforcement purposes include removing drunk drivers, verifying licenses, and conducting immigration checkpoints near the border; checkpoints cannot be used "merely to uncover evidence of ordinary crimes." *Id.* (citing *Edmond*, 531 U.S. at 41–42 (2000)).

Under this characterization, the district court concluded that the bus interdiction constituted an unconstitutional checkpoint. First, the police forced the bus driver to interact with them. The officers knew that Greyhound mandated that its bus drivers stop at specific locations for loading and unloading passengers. The Greyhound schedule was publicly available, and the police exploited it. Thus, "[w]hen the bus driver saw the police waiting, he could not avoid them." *Id.* at 808. Second, the checkpoint's purpose was impermissible because the police sought "to uncover evidence of ordinary crimes, like possession of narcotics." *Id.* at 809.

The district court incorrectly characterized the bus interdiction as an unconstitutional checkpoint. The Supreme Court's *Edmond* opinion illustrates the court's error. The checkpoint in *Edmond* involved "roadblocks." 531 U.S. at 34–35. Police officers advised passing vehicles that they would be "stopped briefly at a drug checkpoint." *Id.* at 35. During this stop, which typically lasted no more than "two to three minutes," *id.* at 36, officers looked for "signs of impairment and conduct[ed] an open-view examination of the vehicle from the outside." *Id.* at 35. They also asked drivers for their licenses. *Id.* In finding the

checkpoint unconstitutional, the Court expressed concern about the "ability of the authorities to construct roadblocks." *Id.* at 42. A central feature of the checkpoint was that the police stopped the motorist for questioning. Drivers could not ignore the officers or decline to answer questions. Thus the law enforcement officer forced the motorist to interact with the authorities.

The Supreme Court's other cases discussing checkpoints similarly involved government officials initiating the stop. *Lidster* involved the police "block[ing] the eastbound lanes of the highway," "forc[ing] traffic to slow down," and—when each vehicle passed through the checkpoint—"stop[ping] [the vehicle] for 10 to 15 seconds." *Illinois v. Lidster*, 540 U.S. 419, 422 (2004). *Sitz* involved a situation where: "[a]ll vehicles passing through a checkpoint would be stopped [by the police] and their drivers briefly examined for signs of intoxication." *Sitz*, 496 U.S. at 447. And *Martinez–Fuerte* involved a permanent immigration checkpoint stationed by law enforcement officers that brought traffic "to a virtual, if not a complete, halt." *United States v. Martinez–Fuerte*, 428 U.S. 543, 546 (1976) (footnote omitted).

This line of checkpoint cases—and the apparent concern with the government initiating the stop and forcing motorists to interact—stems from an essential principle recognized in *Terry*: the essence of an unconstitutional seizure is that a government official has restrained a citizen's liberty. *See Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968) ("Only when [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.").

Here, the Conroe Police Department did not establish an unconstitutional checkpoint. The police did not require the bus driver to stop at the station. The driver made the scheduled stop as required by his employer, Greyhound. The police only approached the driver after he had disembarked from the bus. The police did not order him to interact with them; after the

police approached him, the driver could have declined to speak with the police. The police in no way restrained the driver. Thus, the interaction between the officers and the driver lacked the essential features of a checkpoint. No case supports a contrary conclusion. Instead, as discussed below, the stop is better characterized as a bus interdiction.[5]

**B.     Wise Lacks Standing to Challenge Whether the Bus Driver Voluntarily Consented to the Search**

The Government argues that the district court clearly erred by finding that the bus driver did not voluntarily consent to the Conroe Police Department's search of Greyhound Bus #6408. First, the Government argues that Wise does not have standing to challenge the voluntariness of the driver's consent. Second, even if Wise has standing to challenge the driver's consent, the Government argues that the driver voluntarily consented to the search. Wise disputes these points. We need only address Wise's standing to challenge the search.

Reviewing Fourth Amendment standing de novo, *see Riazco*, 91 F.3d at 754, we conclude that Wise, a commercial bus passenger, lacks standing to challenge the voluntariness of the driver's consent to permit the police to search the bus's passenger cabin.

Wise asserts that he has standing to challenge whether the driver voluntarily consented to the search of the Greyhound bus "because [he] had a possessory interest in his luggage that was in the interior overhead bin of the

---

[5] *See infra* Part IV(C)(1) for a more detailed discussion. The Supreme Court approved an interdiction where police officers boarded a commercial bus during a scheduled bus stop. *See United States v. Drayton*, 536 U.S. 194, 197 (2002). A district court reached the same conclusion. *United States v. Wilmington*, 240 F. Supp. 2d 311 (M.D. Pa. 2002), *aff'd*, 131 F. App'x 336 (3d Cir. 2005). There, the court explicitly refused to characterize a similar bus interdiction effort as an unconstitutional checkpoint. *Id.* at 317. Instead, the court treated it as a "voluntary search and seizure." *Id.*

No. 16-20808

Bus" and "[t]he Conroe Police's request to board the Bus (and the Driver's alleged consent) directly affected [his] possessory interest."

The Government concedes that Wise had a legitimate expectation of privacy in his luggage. However, the Government argues that although Wise had a legitimate expectation of privacy in his luggage, he still lacks standing to challenge the voluntariness of the driver's consent to allow police to search the bus's passenger cabin.

We use a two-pronged test to determine whether a defendant has standing under the Fourth Amendment to challenge a search: "1) whether the defendant [can] establish an actual, subjective expectation of privacy with respect to the place being searched or items being seized, and 2) whether that expectation of privacy is one which society would recognize as [objectively] reasonable." *Riazco*, 91 F.3d at 754 (quoting *United States v. Kye Soo Lee*, 898 F.2d 1034, 1037–38 & n.5 (5th Cir. 1990)) (alteration in original).

Wise satisfies both prongs with respect to his luggage. *See Bond v. United States*, 529 U.S. 334, 336–37 (2000) (citing *United States v. Place*, 462 U.S. 696, 707 (1983)); *see also United States v. Ventura*, 447 F.3d 375, 380 (5th Cir. 2006). Thus, Wise could challenge a situation where the bus driver permitted the police to search Wise's luggage.

However, it does not follow that Wise has standing to challenge the driver's decision to consent to the search of the bus's passenger cabin. Our case law provides some guidance. Automobile "passengers who asserted neither a property nor a possessory interest in the automobile that was searched . . . had no legitimate expectation of privacy entitling them to the protection of the [F]ourth [A]mendment." *United States v. Greer*, 939 F.2d 1076, 1093 (5th Cir. 1991), *op. reinstated in part on reh'g*, 968 F.2d 433 (5th Cir. 1992) (citing *Rakas v. Illinois*, 439 U.S. 128, 148 (1978)). We have recognized that a commercial bus passenger had a reasonable expectation of privacy in his luggage. *Ventura*,

12

447 F.3d at 380 (citation omitted). However, in that same case we clarified that passengers have "no reasonable expectation of privacy in the exterior *luggage compartment* of a commercial bus, and therefore no standing to contest the actual inspection of that compartment, to which the bus operator consented." *Id.* (emphasis added) (citation omitted).

Passengers traveling on commercial buses resemble automobile passengers who lack any property or possessory interest in the automobile. Like automobile passengers, bus passengers cannot direct the bus's route, nor can they exclude other passengers. *See United States v. Hernandez–Zuniga*, 215 F.3d 483, 487 (5th Cir. 2000). Bus passengers have no possessory interest in a bus's passenger cabin—except with regard to their personal luggage. Any reasonable expectation of privacy extends only to that luggage. Passengers have no reasonable expectation of privacy with respect to the bus's cabin. Therefore, Wise lacks standing to challenge the driver's decision to consent to the search of the bus's interior cabin.

**C.    There Is No Basis to Affirm the District Court's Ruling**

We may affirm the district court's ruling on the motion to suppress "based on any rationale supported by the record." *See Waldrop*, 404 F.3d at 368. Wise identifies three potential avenues for affirming the suppression ruling: (1) he was unreasonably seized in violation of the Fourth Amendment when the police questioned him on the bus; (2) he did not voluntarily consent to the search of his backpack; and (3) the officers lacked suspicion to justify a *Terry* pat down. We disagree.

### 1. The Police Did Not Unreasonably Seize Wise

Wise argues that the Conroe Police Department unreasonably seized him in violation of the Fourth Amendment when they questioned him on the Greyhound. He asserts that he felt restrained by police officers while on the

No. 16-20808

bus.[6] Wise identifies a number of factors that contributed to feeling like he could not leave the bus or end the encounter, including: (1) the presence of officers inside and outside the bus; (2) the presence of a police canine and marked police car; (3) the fact that police were conducting a canine drug search near the location they questioned him; and (4) the officers' failure to advise him that he could refuse to answer their questions or comply with their requests.

The Government argues that Wise's interaction with the police was a consensual encounter—not a seizure that could implicate the Fourth Amendment. The Government contests Wise's assertion that the factors mentioned above would make a reasonable person feel that he could not decline to speak with the police officers or otherwise end the encounter. The Government directs us to *Florida v. Bostick*, 501 U.S. 429 (1991), and *United States v. Drayton*, 536 U.S. 194 (2002). Both of these cases shed light on when questioning a bus passenger may constitute an unconstitutional seizure.

The Supreme Court in *Bostick* evaluated a situation where uniformed police officers boarded a bus, questioned a defendant (absent suspicion), and then sought the defendant's consent to search his luggage. *Bostick*, 501 U.S. at 431–32. The Court began its analysis by clarifying that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Id.* at 434. Instead, an encounter is "consensual" so long as the civilian would feel free to either terminate the encounter or disregard the questioning. *Id.* The police do not need reasonable suspicion to approach

---

[6] Wise also asserts that the police lacked reasonable suspicion to question him during the bus encounter. However, the police did not need *any* suspicion to question him in the manner they did. *See Drayton*, 536 U.S. at 201 ("Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means.") (citation omitted).

someone for questioning. *Id.* And "[t]he encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Id.*

The respondent in *Bostick* argued that questioning that occurs "in the cramped confines of a bus" is "much more intimidating" because "police tower over a seated passenger and there is little room to move around." *Id.* at 435. Under those conditions, "a reasonable bus passenger would not have felt free to leave" while the police were on board and questioning the passenger "because there is nowhere to go on a bus." *Id.* The respondent successfully persuaded the court below to adopt a per se rule prohibiting police officers from randomly boarding buses and questioning passengers as a means of performing drug interdictions. *Id.*

The Supreme Court, however, disagreed that randomly questioning a bus passenger constitutes a per se unreasonable seizure. *Id.* at 435–37. The proper inquiry for whether a bus passenger has been seized by police is "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id.* at 436. The Court explained that "no seizure occurs when police ask questions of an individual, ask to examine the individual's identification, and request consent to search his or her luggage—so long as the officers do not convey a message that compliance with their requests is required." *Id.* at 437. As the Court noted, "the mere fact that [the respondent] did not feel free to leave the bus does not mean that the police seized him." *Id.* at 436. The Court understood that the respondent's movements were confined because he was on a bus. *Id.* But it concluded that "this was the natural result of his decision to take the bus; it says nothing about whether or

15

not the police conduct at issue was coercive." *Id.* Later, the Supreme Court in *Drayton* reaffirmed *Bostick*'s core tenets.[7]

The *Drayton* Court evaluated whether police officers who boarded a Greyhound and questioned certain passengers had unconstitutionally seized the passengers whom they questioned. 536 U.S. at 197–200. During a scheduled stop, police boarded a Greyhound bus as part of a routine drug and weapons interdiction effort. *Id.* at 197. "The officers were dressed in plain clothes and carried concealed weapons and visible badges." *Id.* Three officers boarded the bus. *Id.* One officer kneeled on the driver's seat and faced the passengers, so he could monitor them. *Id.* at 197–98. Another officer stationed himself in the rear of the bus. *Id.* at 198. A third officer walked down the aisle, questioning passengers. *Id.* While questioning passengers, the officer avoided blocking the aisle by standing "next to or just behind each passenger with whom [the officer] spoke." *Id.*

One officer approached two individuals who were sitting next to one another. *Id.* The officer showed the individuals his police badge. *Id.* Then, speaking in a conversational tone, he identified himself and asked to search the passengers' luggage. *Id.* at 198–99. The passengers consented to the search. *Id.* at 199. After the luggage search, the officer asked to search the person of one of the passengers. *Id.* The passenger consented. *Id.* The officer felt hard objects on the passenger's upper thighs; he believed these were drug packages. *Id.* He then arrested the passenger. *Id.* A similar process transpired with the other passenger. *Id.*

The Court concluded that the interaction between the officers and the passengers did not amount to an unconstitutional seizure. *Id.* at 203. The

---

[7] The Supreme Court did not decide whether a seizure occurred in *Bostick*; instead, the Court remanded the case to Florida courts after announcing the proper legal standard for evaluating whether an unreasonable seizure of a bus passenger occurred. 501 U.S. at 437.

No. 16-20808

Court reiterated the *Bostick* test for whether a bus passenger was unconstitutionally seized: the test "is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id.* at 202 (quoting *Bostick*, 501 U.S. at 436). The Court found that "the police did not seize respondents when they boarded the bus and began questioning passengers" because "[t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice." *Id.* at 203–04. The Court again rejected the argument that because the encounter took place on a stopped interstate bus, an individual would not feel free to leave the bus or terminate the encounter. *See id.* at 204 (finding that just because "an encounter takes place on a bus does not on its own transform standard police questioning of citizens into an illegal seizure."). The Court speculated that passengers may even feel *less pressured* to cooperate with police officers while on a bus—compared to an encounter elsewhere—thanks to the presence of other passengers as witnesses. *Id.*

Here, the record does not support finding that the detectives seized Wise when they approached him, asked to see his identification, and requested his consent to search his luggage. Salient *Drayton* factors are present. Detectives Sanders and Sauceda gave the Greyhound passengers no reason to believe that they were required to answer the detectives' questions. Detective Sanders, the primary questioning officer, did not brandish a weapon or make any intimidating movements. The officers left the aisle free for passengers to exit. Detective Sanders questioned Wise from behind his seat, leaving the aisle free. Detective Sanders spoke to Wise individually. He used a conversational tone when talking to Wise. Neither detective suggested to Wise that he was barred from leaving the bus or could not otherwise terminate the encounter.

17

The factors identified by Wise—that five officers participated in the interdiction, the proximity to the canine drug search, and the fact the detectives did not inform Wise that he could refuse to answer their questions or leave the bus—are not sufficient to tip the scales in his favor. Wise does not explain why either of the first two factors would change a reasonable person's calculus for whether he could leave the bus or terminate his encounter with the officers. And police are not required to inform citizens of their right to refuse to speak with officers; that is just one factor when evaluating the totality of the circumstances surrounding the interaction. *See id* at 206–07. A reasonable person in Wise's position would feel free to decline the officers' requests or otherwise terminate the encounter. Thus, there is no basis to find that the officers unreasonably seized Wise.[8]

### 2. *Wise Voluntarily Consented to Answering the Officers' Questions and to the Search of His Luggage*

Wise argues that his "consent to and/or cooperation with the officer's requests to ask him questions, search his luggage, exit the bus and empty his pockets were not voluntary." Wise repeats the arguments made for why he was unreasonably seized to assert that his consent to answering questions and permitting the search of his luggage resulted from police coercion. In response, the Government argues that Wise's interactions with the detectives were consensual.

The district court determined that Wise's consent was involuntary because his consent resulted from an illegal seizure (i.e., the unconstitutional checkpoint stop). As discussed, the district court erred in finding that the bus interdiction effort constituted an illegal checkpoint. Thus, the finding that

---

[8] There is also no indication in the record that the officers' interaction with Wise prolonged the duration of the Greyhound's scheduled stop at the station.

No. 16-20808

Wise's consent was involuntary was "influenced by an incorrect view of the law" and should be reviewed de novo. *Toussaint*, 838 F.3d at 507.

We use a six-factor evaluation for determining the voluntariness of a defendant's consent to a search; the factors include:

> 1) the voluntariness of the defendant's custodial status; 2) the presence of coercive police procedures; 3) the extent and level of the defendant's cooperation with the police; 4) the defendant's awareness of his right to refuse consent; 5) the defendant's education and intelligence; and 6) the defendant's belief that no incriminating evidence will be found.

*United States v. Williams*, 365 F.3d 399, 406–07 (5th Cir. 2004) (citations and internal quotation marks omitted). Although Wise identifies this as the appropriate legal test, he does not analyze these particular factors. The record also does not discuss some of these factors (e.g., the defendant's awareness of his right to refuse consent and the defendant's education and intelligence).

However, when "the question of voluntariness pervades both the search and seizure inquiries, the respective analyses turn on very similar facts." *Drayton*, 536 U.S. at 206. As noted, the police did not unreasonably seize Wise. The record provides no basis for finding that he did not voluntarily answer the officers' questions and consent to their requests. Thus, we conclude that Wise's interactions with the officers were consensual.[9]

---

[9] The police did not need Wise's consent to search the backpack. Wise forfeited any reasonable expectation of privacy in the backpack when he voluntarily disclaimed ownership. Wise acknowledges that he "expressly disclaimed ownership or recognition of [the backpack]." An individual who voluntarily disclaims ownership of a piece of luggage is considered to have abandoned that luggage. *See United States v. Roman*, 849 F.2d 920, 922 (5th Cir. 1988). The individual forfeits any expectation of privacy in that luggage and lacks standing to challenge any unlawful search or seizure of the luggage. *See id.* Thus, after disclaiming ownership, Wise no longer had any reasonable expectation of privacy in the backpack, so he could not challenge the subsequent search.

### *3. The Officers Did Not Perform an Unconstitutional* Terry *Pat Down*

Wise argues that the police performed an unconstitutional *Terry* pat down on him. He contends that when the police asked him to leave the bus and come with them, the police had detained him. He argues that the officers' request for him to empty his pockets constituted a pat down. Additionally, Wise asserts that the detectives' decision to take his keys was outside the permissible scope of a *Terry* stop.

The Government contends that Wise voluntarily disembarked from the bus as requested by the officers. The officers did not order Wise off the bus. Moreover, Wise emptied his pockets as a consequence of the detectives' requests; the detectives did not frisk Wise or force him to empty his pockets. Thus, the Government concludes, Wise voluntarily emptied his pockets. Similarly, Wise gave his keys to the detectives upon their request.

The record does not support finding that the police performed an unconstitutional *Terry* pat down of Wise. *Terry* stops represent a narrow exception to the Fourth Amendment's general prohibition against warrantless searches and seizures. *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014). "Under *Terry*, if a law enforcement officer can point to specific and articulable facts that lead him to reasonably suspect that a particular person is committing, or is about to commit, a crime, the officer may briefly detain— that is, 'seize'—the person to investigate." *Id.* (citation omitted). Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). Determining the reasonableness of the officer's suspicion requires assessing the "totality of the circumstances" prior to the stop. *Id.*

Consensual encounters between the police and civilians, however, do not implicate the Fourth Amendment. *Williams*, 365 F.3d at 404. We determined in *Williams* that when police officers asked a Greyhound passenger to disembark and accompany them to the bus terminal's baggage handling area for the purpose of answering questions—and the passenger voluntarily complied—a *Terry* stop did not occur. *Id.* at 405 ("[Defendant's] voluntary entry into the baggage handling area for purposes of answering questions does not amount to a seizure, nor does it convert the consensual encounter into a *Terry* stop.").

Here, the police asked Wise to speak with them off the bus. The police did not indicate that his compliance was required. Once off the bus, the police did not restrain Wise. They also did not tell him that he must obey their requests. The police asked Wise to empty his pockets, and he complied. He also complied with the police officers' requests to show them his identification card and keys. Wise has not explained why this interaction was anything but a consensual encounter.

Even if Wise could characterize the interaction as a *Terry* stop-and-frisk, the stop-and-frisk would be permissible under the Fourth Amendment. *See Hill*, 752 F.3d at 1033. Detectives Sanders and Sauceda, drawing on their experience and specialized training, could reasonably infer from the circumstances surrounding their interaction with Wise that he may have been in the process of committing a crime. The detectives witnessed Wise pretend to sleep on the Greyhound. Wise then produced a ticket with a "very generic" name: "James Smith." He denied ownership of a backpack that was sitting next to his own duffle bag. Yet, no other passengers sat near the backpack. The officers discovered that the backpack contained a substance they believed to be cocaine. The detectives were aware that narcotics traffickers often carry weapons. Evaluating the totality of the circumstances, the detectives

established requisite suspicion to detain Wise for questioning and to request that he empty his pockets. *See United States v. Reyes*, 349 F.3d 219, 225 (5th Cir. 2003).

## V. CONCLUSION

The district court erred in characterizing the bus interdiction as an unconstitutional checkpoint stop. Also, Wise lacks standing to challenge the bus driver's consent to the officers' request to search the Greyhound's passenger cabin. Finding there is no other basis in the record to affirm the district court's ruling on the motion to suppress, we REVERSE the district court's suppression order.